937 F.2d 920
 Michael N. DOTSON, Wayne Musgrove, and all others similarly
situated, Plaintiffs-Appellees,
v.
Lemuel CHESTER; Jack Colbourne; Charles Dayton; William
I. Wingate; Calvin Travers, in their individual and
official capacities as members of the Board of County
Commissioners of Dorchester County, Defendants-Appellants,
and
Donald Satterfield; Phillip H. McKelvey, Sheriff of
Dorchester County, Defendants (Two Cases).
 Nos. 90-6858, 90-6900.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 4, 1991.
Decided June 5, 1991.
As Amended June 20 and July 11, 1991.
 
 James Patrick Gillece, Jr., argued (Roger D. Redden and Lynett M. Phillips, on brief), Piper & Marbury, Baltimore, Md., for defendants-appellants.
 Nevett Steele, Jr., Nevett Steele, Jr., P.A., argued (Patricia L. Ingram, Whiteford, Taylor & Preston, on brief), Towson, Md., for plaintiffs-appellees.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and BRITT, District Judge for the Eastern District of North Carolina, sitting by designation.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The Dorchester County Commissioners appeal from a district court order holding the County responsible for attorneys' fees and expenses allocated to the Sheriff of the Dorchester County Jail in a suit over jail conditions brought pursuant to 42 U.S.C. Sec. 1983. The suit had been settled by a stipulated agreement without determining whether the County or the State should pay the Sheriff's portion in the event that the Sheriff did not pay.[1] The Commissioners also appeal from a court order requiring the payment of additional attorneys' fees and costs attributable to the appellees' attempts to collect the original fee award first from the Sheriff, and subsequently from the County.
 
 
 2
 We agree with the district court's conclusion that, under state law and the county code, the Sheriff possesses final policymaking authority for the County in his operation of the County Jail, and the County can be held responsible for attorneys' fees and expenses arising out of his actions. In addition, we find that the judge acted within his discretion in awarding the additional attorneys' fees and expenses accrued in collection efforts.I.
 
 
 3
 On November 19, 1987, Michael Dotson and other inmates (the "inmates") of the Dorchester County Jail (the "County Jail") filed a 42 U.S.C. Sec. 1983 suit against the County Commissioners of Dorchester County (the "Commissioners") and Jail Administrator, Donald Satterfield, alleging unconstitutional conditions in the County Jail and seeking declaratory and injunctive relief. On February 1, 1988, after the Commissioners brought a motion under Federal Rule of Civil Procedure 19 for failure to join a necessary party, the complaint was amended to include Sheriff Phillip H. McKelvey. On October 3, 1988, the parties settled the case by a Settlement Agreement which permitted allocation of legal fees and costs between the Commissioners and the "Sheriff."[2] For the purposes of the Settlement Agreement, the "Sheriff" referred to the Sheriff and the Jail Administrator; we shall follow suit. A month later, the district court approved the Settlement Agreement. On November 23, the judge concluded that, under 42 U.S.C. Sec. 1988, the inmates were the "prevailing party" and awarded them $101,420.75 in attorneys' fees and $30,220.62 in expenses.
 
 
 4
 On January 20, 1988, the judge allocated the fees proportionally between the Commissioners and the Sheriff according to his perception of their relative responsibility. The Sheriff bore approximately four-fifths of the fees and costs; the Commissioners bore the remaining one-fifth.[3] The judge explained that the division reflected his belief that the Commissioners were "not responsible for the supervision, management, regulation and day-to-day control of the Dorchester County Jail." The Commissioners paid their portion.
 
 
 5
 The Sheriff did not pay his share. The inmates attempted to garnish the Sheriff's assets; however, they discovered that he had insufficient assets in his official capacity. On April 3, 1989, the inmates brought a writ of garnishment against Dorchester County's bank account to obtain the amount allocated to the Sheriff. The district court quashed the writ, apparently believing that the Sheriff's two insurance policies would cover the necessary sum. The court later acknowledged that it had "encouraged counsel to pursue" recovery from the insurance policies. Memorandum Op., Aug. 29, 1990, at 2. After further legal investigation, however, the inmates ultimately concluded, and the judge appears to have accepted, that recovery would not be forthcoming from the insurance carriers.
 
 
 6
 On April 20, 1990, the inmates once again began to look to the County's assets and notified the Commissioners by letter of their intentions to garnish the bank account.[4] On April 29, the Commissioners moved for immediate injunctive relief to prohibit garnishment. The judge denied the motion on June 19, 1990, in an order holding that "Dorchester County is a municipality subject to liability under 42 U.S.C. Sec. 1983 and that Sheriff McKelvey is a policymaker for the county when operating the Dorchester County Jail...." Memorandum Op., June 19, 1990, at 1.[5] The Commissioners appealed to the Fourth Circuit.
 
 
 7
 On June 27, 1990, the district court quashed the inmates' second attempt to garnish in light of the appeal. The court, however, did not stay the June 19, 1990 order.
 
 
 8
 On July 16, 1990, the inmates asked the district court to award fees and expenses pursuant to 42 U.S.C. Sec. 1988 for their attempts to "execute the judgments rendered against Sheriff McKelvey." On August 29, the district court found the Sheriff and the County responsible for $31,773.90 in supplemental fees and $1451.42 in costs.[6] The court did not apportion the award, noting "this court has already held that Dorchester County is ultimately liable for any judgment entered against these defendants." Memorandum Op., August 29, 1990, at 9-10. The Commissioners have also appealed that order.
 
 
 9
 The appeal before us consequently involves (1) the order that the County was ultimately liable for the fee awards against the Sheriff and (2) the order that the County was responsible for additional attorneys' fees and costs arising from the inmates' attempt to collect the initial fees judgment against the Sheriff.
 
 II.
 
 10
 On appeal the Commissioners first argue that the Sheriff is a state policymaker under state laws and regulations when he is operating the County Jail and the State is liable for the Sheriff's portion. The Commissioners insist that they have only limited power over the County Jail under state law, that the State sets standards for the County Jail, and that the County's funding responsibility cannot create County liability. The Commissioners also claim that the Settlement Agreement prevented the County from being liable for the Sheriff's portion. Second, the Commissioners argue that 42 U.S.C. Sec. 1988 does not permit what they term "third party debt collection efforts."
 
 
 11
 The inmates, in turn, claim that the Sheriff is a county policymaker when operating the County Jail. The inmates argue that, even if the Sheriff is a state official in some respects, he is, nevertheless, the final policymaker for the County with respect to the County Jail and therefore, can create county liability. The inmates also allege that the County Jail is a county facility over which the Sheriff has management responsibilities, undiminished by state guidance. In addition, the inmates claim that Sec. 1988 permits the award of attorneys' fees arising from attempts to collect the original award. They argue that a contrary result would render meaningless the original right to attorneys' fees.
 
 III.
 
 12
 The Settlement Agreement's provision on fee apportionment is not determinative of the appeal; it does not prevent the County from being liable for the Sheriff's portion. The Settlement Agreement apportioned fees between two entities--the Commissioners and the Sheriff. The apportionment may have been desirable at the time, and agreed to by the inmates, because of the widely held belief that the Sheriff's insurance policies would cover the Sheriff's portion. The apportionment, however, was not intended to determine liability between the County and the State. It was concerned only with the method of collection, not intending to limit the responsibility of the County by foreclosing liability should the Sheriff fail to pay. Until the inability to collect on the insurance policies became apparent, the precise dimensions of the Sec. 1983 issue did not confront the parties. The Settlement Agreement does not prevent the County from bearing ultimate responsibility for the Sheriff's portion.
 
 
 13
 The inmates also seek to garnish the County 's bank account. Although the decision that the County is responsible does affect the Commissioners because they are the official representatives of the County, such a technical decision is not the same as one concluding that the Commissioners have additional liability because their policies alone created the situation. See City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). We must therefore confront the question, should the State or County be liable for the judgment rendered against the Sheriff arising out of the Sheriff's operation of the County Jail?
 
 
 14
 Under 42 U.S.C. Sec. 1983, counties, like other local government entities, can be sued for violations of constitutional rights. See Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469, 483 n. 12, 106 S.Ct. 1292, 1300 n. 12, 89 L.Ed.2d 452 (1986). The violation, however, must bear some relation to the county's "policy or custom." Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36; see City of St. Louis v. Praprotnik, 485 U.S. 112, 124 n. 1, 108 S.Ct. 915, 924 n. 1, 99 L.Ed.2d 107 (1988). The contours of Sec. 1983 municipal liability have been delineated in cases arising after Monell. See Praprotnik, 485 U.S. at 123, 108 S.Ct. at 923-24. County liability for the Sheriff's operation of the County Jail depends on whether the Sheriff had final policymaking authority for the County over the County Jail. In Praprotnik, the Court, in an opinion written by Justice O'Connor, upheld the "guiding principles" established in Pembaur:
 
 
 15
 First, ... municipalities may be held liable under Sec. 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to Sec. 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.
 
 
 16
 Id. at 123, 108 S.Ct. at 924 (citations omitted) (emphasis in original). Justice O'Connor reiterated that "the identification of policymaking officials is a question of state law," id. at 124, 108 S.Ct. at 924, and, although noting that "state law will [not] always speak with perfect clarity," id. at 125, 108 S.Ct. at 925, she insisted that "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." Id. She cautioned against "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies...." Id. at 127, 108 S.Ct. at 926. The Praprotnik test indicates liability relies more on final policymaking authority than on the technical characterization of an official as a state or county employee. Hence, a "corollary proposition" exists, namely, "whether an official acts on behalf of the county or the state is similarly a question of state law." Owens v. Fulton County, 877 F.2d 947, 950 (11th Cir.1989).
 
 
 17
 Other circuit courts have searched state and local laws to determine whether the actions of a county sheriff represent final policymaking authority for the county, thereby creating county liability. In Parker v. Williams, 862 F.2d 1471 (11th Cir.1989), the court wrote:
 
 
 18
 The relationship between Amerson [the sheriff] and the county in this case is central to the evaluation of whether the county can be liable for Amerson's actions. If in hiring and training Williams, Sheriff Amerson was acting as the final repository of county authority, then the county may be liable for constitutional violations arising from the sheriff's actions. Although the Alabama Supreme Court stated that Amerson was an employee of the state, that does not resolve the issue of whose duty Amerson was implementing when he hired Williams. Amerson's functional role in conducting his personnel policy is more significant than his technical status as an employee of the state. The pivotal point is whether Amerson was exercising county power with final authority.
 
 
 19
 Id. at 1478 (citations omitted). In the appellate decision in Pembaur v. City of Cincinnati, 746 F.2d 337 (6th Cir.1984), rev'd, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the court stated that Ohio law "clearly indicate[s] that the Sheriff can establish county policy in some areas. We conclude, therefore, that, in a proper case, the Sheriff's acts represent the official policy of Hamilton County and, as such, may be the basis for Sec. 1983 liability." Id. at 341. Although the Supreme Court reversed in Pembaur, the Court stated that it did not question the conclusion that under appropriate circumstances the county sheriff could establish county policy. 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12. And in Blackburn v. Snow, 771 F.2d 556 (1st Cir.1985), the court decided that "state law expressly designates the Sheriff as the individual responsible for promulgating security policy with respect to correction facilities" and that the Sheriff had "appointed himself superintendent of the County's jails during his tenure as Sheriff...." Id. at 571. The court concluded that "there could hardly be a clearer case of county liability...." Id. The court added:
 
 
 20
 What the County misunderstands is that it is not because county officials other than the Sheriff were "involved" in the promulgation of the strip search, that it is liable under Monell, nor is it because county officials failed properly to "oversee" the Sheriff. Rather, it is liable because the Sheriff was the county official who was elected by the County's voters to act for them and to exercise the powers created by state law. Accordingly, the Sheriff's strip search policy was Plymouth County's policy, and the County must respond in damages for any injuries inflicted pursuant to that policy.
 
 
 21
 Id. (emphasis in original); see Turner v. Upton County, Tex., 915 F.2d 133, 136 (5th Cir.1990) (concluding that the "county sheriff is the county's final policymaker in the area of law enforcement ... by virtue of the office to which the sheriff has been elected...."), cert. denied, --- U.S. ----, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991); Zook v. Brown, 865 F.2d 887, 895 (7th Cir.1989) (concluding that by county delegation and approval, the sheriff was responsible for establishing final county policy on discipline); Anderson v. Gutschenritter, 836 F.2d 346, 349 (7th Cir.1988) (concluding that the sheriff was responsible for running the county jail and therefore his action represented county policy); Weber v. Dell, 804 F.2d 796, 803 (2d Cir.1986) (concluding that the sheriff established "county jail policy" regarding strip searches and therefore the county was liable), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); Mosier v. Robinson, 722 F.Supp. 555, 556-57 (W.D.Ark.1989) (concluding that the county was a proper party to a suit against the sheriff for his conduct at the jail where "a county policy of condoning violations by the sheriff can be inferred"); Farris v. Moeckel, 664 F.Supp. 881, 891 (D.Del.1987) (concluding that the "relationship between the County and the Sheriff's Department to be so close as to render the County liable for any unconstitutional policies, practices or customs instituted by the sheriff...."); see also Gobel v. Maricopa County, 867 F.2d 1201, 1207-09 (9th Cir.1989) (surveying state law and concluding that the plaintiffs might be able to prove that the county attorney "was acting as a policymaker for Maricopa County ... and that Maricopa County is therefore liable if the carrying out of that policy violated the plaintiffs' civil rights.").
 
 
 22
 We turn to examine Maryland and Dorchester County law to determine whether the Sheriff possessed final policymaking authority for the County when managing and operating the County Jail. We bear in mind Justice O'Connor's recognition that the "identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense.... [O]ne may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies." Praprotnik, 485 U.S. at 124-25, 108 S.Ct. at 924. Our exploration passes through case law, the county code, state statutes, and state regulations.
 
 
 23
 The district court judge found that the County had the authority to operate the County Jail and that the Sheriff possessed final policymaking authority over the County Jail for the County. He relied on the report and recommendation of the magistrate judge which he "adopted ... in full" in reaching his conclusion. He cited the magistrate judge's statement that a "symbiotic relationship" exists in Dorchester County: "While the sheriff, an independently elected official, is charged with the care and custody of prisoners committed to him, he cannot operate without the fiscal cooperation and agreement of the Board of County Commissioners." Memorandum Op., June 16, 1990, at 6 (citing August 19, 1988 Report and Recommendation of Magistrate Judge Chasanow at 40).[7] He then added, "The Commissioners maintain the Jail through local funding; they have delegated the responsibility of operating the Jail to the Dorchester County Sheriff, the de facto administrator of the Jail." Id.
 
 
 24
 The Commissioners dispute this finding, arguing that the Sheriff is a state official when managing the County Jail.[8] They argue that Maryland courts have recognized the Sheriff as a state official. They claim that, as a non-charter county, the County has no authority "to operate, manage or even build a jail," only the responsibility to fund "the cost of jail maintenance, prisoner supplies and staff salaries," which alone does not create liability. They contend that state regulations set policy for the management and operation of county jails, that only a state commission can close the jail for failures to comply with mandatory standards, and that only the Governor can remove the Sheriff.
 
 
 25
 The inmates argue that the Sheriff was sued as a county policymaker under the Dorchester County Code, which places responsibility for the County Jail in the hands of the Sheriff. They claim that, even if the Sheriff is a state officer in certain capacities, he is the final county policymaker when operating the County Jail. The inmates argue that the County cannot avoid liability by vesting authority in a "state" official. The inmates contend that, under state law, the County Jail is, was built as, and has been funded as, a "local detention facility" not operated by the State Department of Corrections. They claim that the Maryland Commission on Correctional Standards sets only minimum standards for non-state operated jails, and the County is ultimately responsible for the County Jail's conditions.
 
 
 26
 Because our inquiry focuses on the entity operating the County Jail, i.e., whether the Sheriff acts "as the final repository of county authority," Owens, 877 F.2d at 950, Maryland cases discussing the employment status of the sheriff are not dispositive. In Rucker v. Harford County, 316 Md. 275, 558 A.2d 399 (1989), the Maryland Court of Appeals concluded that a county sheriff was a state employee for the purposes of tort liability. Id. at 402. Rucker, however, does not compel the conclusion that the Sheriff, when managing the County Jail, is a state policymaker. Rucker addressed an incident where a sheriff and state police, in attempting to stop an escaping toll dodger, injured a bystander. Despite its holding, the court stated, "[t]his conclusion does not mean that, for some purposes and in some contexts, a sheriff may not be treated as a local government employee." 316 Md. at 289, 558 A.2d at 406. The court explained,
 
 
 27
 The control of the functions of the sheriffs by State common law, by the General Assembly and by the judiciary, coupled with the statewide nature of many of the sheriffs' duties, strongly reinforce the view that sheriffs are State rather than local government officials.
 
 
 28
 316 Md. at 287-88, 558 A.2d at 405. The Sheriff's activities which we investigate--operating the County Jail which houses county prisoners, pursuant to county regulations, and funded by the County--differ from "the statewide nature" of the Sheriff's duties involved in Rucker. See Soderbeck v. Burnett County, Wis., 821 F.2d 446, 451 (7th Cir.1987) (concluding that the Wisconsin law made the county sheriff "solely an officer of the state when fulfilling his constitutional obligations"); Himple v. Moore, 673 F.Supp. 758, 7598 (E.D.Va.1987) (concluding that the sheriff was not a county officer under Virginia law when arresting individuals and the county could not be held liable for his acts). Moreover, at the beginning of Rucker, the court stated,
 
 
 29
 we wish to emphasize that we answer this question as a matter of Maryland law only. Whether the Harford County Sheriff's Office is to be regarded as a State or local government agency, and whether the Sheriff and Deputy Sheriffs are to be regarded as State or local government employees, for the purposes of the Eleventh Amendment or 42 U.S.C. Sec. 1983, are federal law issues which are not before this Court....
 
 
 30
 Rucker, 316 Md. at 280-81, 558 A.2d at 401. Interestingly, after Rucker, the Maryland legislature appears to have ensured that, regardless of the characterization of the Sheriff, the counties would pay for sheriffs' torts. The Rucker court had concluded that the Local Government Tort Claims Act imposed "no obligation on counties to pay for liability claims rendered against sheriffs...." 316 Md. at 294, 558 A.2d at 408. The legislature amended the state law, 1990 Md.Laws ch. 508, to require the counties either to carry insurance to cover claims against sheriffs or to reimburse the State for the costs of paying and defending claims.
 
 
 31
 We do not quarrel with the fact that, in some respects, the Sheriff is bound by state law. The Maryland Constitution creates the Sheriff's office. Md. Const. art. IV, Sec. 44. The Governor fills vacancies by appointment. Id.[9] State law requires the Sheriff to "safely keep all persons committed to his custody," Md.Ann.Code art. 87, Sec. 45, and to "provide food and board for all prisoners committed to [his] ... charge." Id. Sec. 46.
 
 
 32
 State statutes, however, do not specifically empower the Sheriff to build, fund, and operate the County Jail. The provision setting forth the duties and payment for sheriffs in particular counties states only with respect to Dorchester County:
 
 
 33
 (1) The Sheriff of Dorchester County shall receive a salary ... and be allowed the actual cost of maintenance of automobiles and the county jail. The Sheriff shall appoint a chief deputy sheriff, one assistant deputy sheriff, other deputies, and a jail matron if approved by the County Commissioners. A deputy or matron shall receive the compensation provided in the county budget.
 
 
 34
 (2) If the Sheriff becomes incapacitated and the position of chief deputy is vacant, the County Commissioners shall appoint a chief deputy sheriff.
 
 
 35
 Md.Cts. & Jud.Proc.Code Ann. Sec. 2-309(k). Moreover, the precise dimensions of sheriffs' duties in Maryland frequently have been established by county codes or other local laws. See Soper v. Montgomery County, 294 Md. 331, 338, 449 A.2d 1158, 1161-62 (1982); Baumgartner v. State, 21 Md.App. 251, 258, 319 A.2d 592, 597-98 (1974); Beasley v. Ridout, 94 Md. 641, 65657, 52 A. 61, 65 (1902); The Maryland Sheriff v. Modern and Efficient Administration of Justice, 2 Balt.L.Rev. 282, 288 (1973). Thus, the Sheriff is not always a state employee or always a county employee. He may, on occasion, be both, or sometimes one and sometimes the other. It all depends on the particular function the Sheriff is performing.
 
 
 36
 If Dorchester County were a charter county the County would be liable for the Sheriff's operation of the jail. Charter ("home-rule") counties are expressly granted the power to "establish, maintain, regulate and control county jails, and county houses of correction or detention and reformatories, and to regulate all persons confined therein...." Md.Ann.Code art. 25A, Sec. 5(C). In charter counties, state statutes confer authority on the counties to transfer control of the jail from the sheriff to a county warden. Md.Ann.Code art. 87, Sec. 48; see Epps v. Levine, 457 F.Supp. 561, 565 n. 2 (D.Md.1978). Section 48 permits the councils of charter counties to
 
 
 37
 provide for the appointment of a qualified person as jailor or warden of the county jail.... A jailor or warden appointed shall be responsible for the safekeeping, care and feeding of all prisoners in the jail.... These provisions do not affect the powers and duties of the Sheriff of the county with respect to the safekeeping and custody of all prisons, except when the prisoners are in jail....
 
 
 38
 We have no doubt but that sheriffs are final policymakers for counties when operating jails in charter counties.
 
 
 39
 Dorchester County has not adopted a charter; instead, Dorchester County is run by a county commission. The Commissioners have argued that, because Md.Ann.Code art. 25, Sec. 3, listing enumerated powers given to commission counties, does not confer a parallel power to establish, maintain, and regulate a county jail, noncharter counties do not possess such powers. The argument neglects the beginning language of Sec. 3: "The county commissioners of each county in this State, in addition to, but not in substitution of, the powers which have been or may be granted to them, have the following express powers." Md.Ann.Code art. 25, Sec. 3(a)(1). Section 6 of article 25 emphasizes the error in concluding that the absence of a provision in Sec. 3 addressing county maintenance and operation of the county jail is determinative. Section 6 entitled "Section 3 conveys supplementary authority," states:
 
 
 40
 The provisions as set forth in Sec. 3 hereof are intended to supplement or to supply authority in the county commissioners of various counties to do and perform various acts, matters and things not otherwise provided for by law.... Nothing contained in Sec. 3 shall in any manner be considered a limitation or restriction on any existing powers and authority granted the county commissioners of any county nor shall any broader or more unrestricted power or procedure vested in or authorized to the county commissioners of any county with respect to any matters specifically provided for by a public local law be deemed in any manner limited by any of the provisions of Sec. 3.
 
 
 41
 Md.Ann.Code art. 25, Sec. 6 (emphasis added).
 
 
 42
 Both the Dorchester County Code (the "Code") and state law indicate that Dorchester County has the authority to establish, maintain, and regulate the County Jail. The Code demonstrates that, although the Sheriff, a constitutional officer, now has custody of the County Jail, the County Jail remains a county institution and the County merely has placed final policymaking authority in the Sheriff. Indeed, from the day the County built the County Jail, the County has been responsible for its conditions and operation.
 
 
 43
 According to the magistrate judge's 1988 findings, the County Jail "is over 100 years old and in poor physical condition." Report and Recommendation at 34. We have searched backwards to discover the relation between the County, the Sheriff, and the County Jail one hundred years ago. The 1888 Code contained sections relating to the Sheriff and the County Jail. Only three sections address the Sheriff. Section 282 stated that the Sheriff "shall not be entitled to receive more than thirty cents a day for keeping and boarding each prisoner...." * Section 283 reimbursed the Sheriff for expenses in transferring prisoners and section 284 paid the Sheriff a fee for "executions issued by any justice of the peace." The section relating to the County Jail provided that
 
 
 44
 [t]he county commissioners ... shall appoint a nonpartisan board ... to act as jail supervisors without compensation ...; ... they shall have supervision and control of the jail and adjoining grounds ...; they shall pass and enforce all necessary rules for the protection of the health, cleanliness and comfort of the inmates, and for the regulations of all matters connected with the general management of said jail.
 
 
 45
 1 Md.Code of Pub.Local Laws art. 10, Sec. 191 (1888).[10] In 1888, the County empowered a nonpartisan board to make final policy decisions for the County about the conditions and management of the County Jail.
 
 
 46
 The 1930 Code altered the section relating to the County Jail and abolished the nonpartisan board:
 
 
 47
 The president of the County Commissioners ..., the county treasurer and the State's Attorney for said county, for the time being, shall act as jail supervisors for said county without pay; they shall have supervision and control of the jail and adjoining grounds ...; they shall pass and enforce all necessary rules for the protection of the health, cleanliness and comfort of the inmates, and for the regulation of all matters connected with the general management of said jail....
 
 
 48
 1 Md.Code of Pub.Local Laws art. 20, Sec. 338 (1930). The section also empowered the "jail supervisors" to "make such by-laws, rules and regulations as they may think necessary and proper, for the clothing, regulation, management, control and conduct" of prisoners engaged in work or manual labor. Id. The sections regarding the Sheriff remained constant, although the entitlement was raised to seventy-five cents. Id. at Secs. 501-3. In 1930, the County, through the President of the County Commissioners, operated and managed the County Jail.
 
 
 49
 By 1961, however, interim amendments, passed in 1939, 1939 Md.Laws ch. 777, had reduced the actual involvement by the County Commissioners in the County Jail by transferring certain responsibilities to the Sheriff. The language referring to jail supervisors and their management responsibilities disappeared. The rest of the language remained; however, the "Sheriff" was substituted for the 1930 Code's reference to "jail supervisors": "said Sheriff is hereby empowered to make such by-laws, rules and regulations as he may think necessary and proper, for the clothing, regulation, management, control and conduct" of prisoners engaged in work or manual labor. Md.Code of Pub.Local Laws, Dorchester County Sec. 321 (1961). Consistent with the transfer of management responsibilities from a County appointed board to the County Sheriff, the sections relating to the Sheriff were amended. The Commissioners' old duty of funding was retained: "It shall be the duty of the County Commissioners to pay for all supplies and provisions necessary, in their judgment, for the support and maintenance of all persons committed to the jail...." Sec. 335. A lengthy section outlining the Sheriff's new duties appeared:
 
 
 50
 It shall be the duty of the sheriff to keep a correct and full statement ... of all persons committed to the jail ... [which] shall at all times be open to the inspection of the County Commissioners; and at the first meeting of the County Commissioners in each month the sheriff shall make to them, under oath, a full and complete report of all persons confined in the jail ...; the said sums of money hereinbefore authorized to be levied and paid the sheriff shall be in full of all claims of said sheriff against Dorchester County, or said County Commissioners for his care, labor, responsibility and expenses in discharging the duties of this office, including the keeping safely in jail of prisoners committed to his custody; supplying to said prisoners the provisions furnished for them, by the County Commissioners, properly cooked and served in a proper and sanitary condition as hereinbefore provided and keeping the jail in a clean and tidy condition....
 
 
 51
 Sec. 356 (emphasis added). To the present, this division remains largely intact. See Md.Code of Pub.Local Laws, Dorchester County Secs. 14-1, 20-1-5 (1974). Indeed, the 1974 Code provision relating to the County Jail contains the subtitle, "Sheriff to supervise jail." Sec. 14-1.
 
 
 52
 Regardless of the County's reasons for transferring the final policymaking authority from county citizens to the County Sheriff (also, generally, a Dorchester County citizen), the historical changes in the Code demonstrate that the County Jail has been and remains a county facility. Although we recognize Rucker's caution that county funding is "not dispositive," 316 Md. at 281-82, 558 A.2d at 402, we emphasize that the County has not contested its obligation, "to fund the maintenance and operation of the jail."[11] The County cannot escape liability for its aging jail by slowly transferring the final policymaking authority to an officer who, on occasion, has been considered a state employee.
 
 
 53
 The conclusion that the Sheriff acts with final policymaking authority for Dorchester County is buttressed by state statutes. Various provisions state, assume, or imply that county jails are operated by counties, not by the State through sheriffs. Article 27 Sec. 705(a) states that a "local detention center means any jail ... operated by one or more counties...." Md.Ann.Code art. 27, Sec. 705(a) (emphasis added). Another section states the "governing body of one or more counties may establish and maintain a local detention center and may enter into a written agreement with each other as to allocation of responsibility, construction, operation, maintenance, and appointment of personnel. The State may, but need not be a party to any such agreement." Sec. 705(b) (emphasis added). The listing of state prison facilities does not include county jails. See Md.Ann.Code art. 27, Sec. 689. The State only may place state prisoners in county jails "pursuant to express authorization or by agreement between the local political subdivision and the Division of Correction," see 62 Op.Att'y Gen. 829, 837-37 (1977), and the State must reimburse the counties. Md.Ann.Code art. 27, Sec. 690. If a community adult rehabilitation center is leased or purchased by the county pursuant to state authorization, Md.Ann.Code art. 27, Sec. 710(b), it "shall be operated by the county, and the director, staff, and other employees of the center shall be employees of the county." Md.Ann.Code art. 27, Sec. 710A(a). And if the County chooses to replace the County Jail with a prison farm, Md.Ann.Code art. 25, Sec. 128, although operational responsibilities remain with officials who operate the County Jail, Sec. 130(c), the County Commissioners have the explicit power to determine whether the prisoners shall be paid compensation during imprisonment, Sec. 131, to choose the crops to be planted, and to prepare the budget for "the care, operation and maintenance of the property committed to its care...." Sec. 133. None of these sections create any impression other than that the County Jail is a county operated jail.
 
 
 54
 In addition, distinctions within the statute establishing the Commission on Correctional Standards, Md.Ann.Code art. 41, Sec. 4-401, support our conclusion that the County is liable for the Sheriff's operation of the County Jail.[12] Section 4-401 defines "local correctional facility" as "all places of correctional confinement or correctional institutions within the State of Maryland, primarily operated by local governments." Sec. 4-401(a)(6) (emphasis added), whereas "state correctional facilities" are institutions "primarily operated by the Maryland State government," presumably those facilities operated by the Department of Corrections listed under Md.Ann.Code art. 27, Sec. 689. The Commission "[s]hall advise the Secretary regarding all mandatory and approved standards for state and local correctional facilities." Md.Ann.Code art. 41, Sec. 4-401(d)(1). "Mandatory standards" "shall apply to all State and local correctional facilities." Sec. 4-401(b)(7). "Approved standards" "shall apply to all State correctional facilities and may be adopted, in whole or in part, for use by any local correctional facility." Sec. 4-401(b)(8) (emphasis added). All jails within the State are to comply with the mandatory standards, addressing issues such as inmate rights and security. Compliance does not depend on whether the jail is run by a sheriff, a jail warden, the State, a county, a combination of counties, a city, or anyone else.
 
 
 55
 The Commissioners have claimed that, because of these standards, the State and the State alone controls the Sheriff's operation of the County Jail. The conclusion is erroneous. According to state regulations, the Commissioner's audit is forwarded to "the managing official and other authorities of the jurisdiction." Md.Regs.Code 12.14.01.02(c). The broad standards often require only the establishment of written policies to cover situations, leaving open room for interpretation and sheriff and county responsibility for implementation. See Weber v. Dell, 804 F.2d 796, 803 (2d Cir.1986) (holding that a state administrative prison code requiring thorough searches did not mandate the sheriff's decision to implement a strip search policy, and, therefore, the county, not the state, was liable), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).
 
 
 56
 Moreover, the Commission only possesses discretionary authority to order operations to cease at a jail in violation of the mandatory standards. Md.Ann.Code art. 41, Sec. 4-401(d)(6). The regulations provide that the Secretary "may, at his discretion, exercise any of the powers ... with respect to final decisions after a hearing on the closure of a facility or the cessation of operations." Md.Regs.Code 12.14.01.08. The State probably cannot be held responsible for failures to close noncompliant county jails. For example, in Reid v. Kayye, 885 F.2d 129, 131 (4th Cir.1989), the court held that North Carolina had no duty to remedy challenged county jail conditions under Sec. 1983 despite state laws requiring the development of minimum standards for the operation of local confinement facilities, the semiannual inspection of such facilities by the State, and the state's discretionary power to order corrective action or close the facility.[13] State law does not suggest that only the State may set standards or establish policies for the County Jail. The State's decision to facilitate compliance in all correctional institutions with federal and state laws does not absolve the County from liability. The Commission's existence does not transform the County Jail into a state facility.
 
 
 57
 Realizing that the present case demonstrates the truth of Justice O'Connor's prediction that state and local law will not always speak with perfect clarity, we conclude that both state and local law point to the Sheriff as the final policymaker for the County when operating the County Jail, and hold that the County is properly responsible for the attorney's fees and costs apportioned to the Sheriff. See Revene v. Charles County Comm'rs, 882 F.2d 870, 874 (4th Cir.1989) ("The claim against the sheriff is in his official capacity.... Rightly construed under current doctrine, this comes to a claim that in the realm of county law enforcement, the sheriff was the duly delegated policy-maker for the county, and it is therefore effectively a claim against the governing body of the county."). As the Parker court stated, "Although the county's authority to provide a service may be vested in an official designated as a state official, the county cannot be insulated from liability based on its responsibilities with regard to that service by the simple expedience of vesting power in a state official." Although the County chose to alter the original delegation of operational authority, the County cannot escape liability for the County Jail. Even had the County always operated the County Jail under the sheriff-county partnership existing at present, the County nonetheless would be liable because, as in Parker, "[t]he county in essence provides the facility and the money for upkeep, and the sheriff in essence manages the institution." 862 F.2d at 1479. And the Parker court's note regarding the necessity for ultimate liability also applies here:
 
 
 58
 From a policy point of view, county liability where the county has limited control over policy decisionmakers does not strike us as misplaced. The fact that a sheriff executes county policy with considerable autonomy from the county is undercut by the sheriff's dependence on county voters. Arguably, because an Alabama sheriff is voted into office by county residents, the sheriff is more accountable to the county electorate than to the county government. A finding of liability against the county translates into compensatory damages against the taxpayers of the county. One thus comes full circle to the electorate's capacity to control the sheriff: "[T]he compensatory damages that are available against a municipality may themselves induce the public to vote the wrongdoers out of office." County liability for policies established by ultimate repositories of county power creates an incentive for deterring unconstitutional conduct in the future.
 
 
 59
 Parker, 862 F.2d at 1481 n. 10 (quoting Newport v. Fact Concerts, Inc., 453 U.S. 247, 249, 101 S.Ct. 2748, 2750, 69 L.Ed.2d 616 (1981)). For years the County could have rectified conditions at the County Jail. The confused historical status of sheriffs and the complicated jurisprudential analyses under Sec. 1983 do not provide the County with a route by which to escape the final reckoning. The Sheriff held the final policymaking authority for the County over the operation and management of the County Jail. The County is liable for the attorneys fees and costs originally allocated to the Sheriff.
 
 IV.
 
 60
 Attorneys fees and costs under 42 U.S.C. Sec. 1988 for the inmates' attempts to enforce their judgment were properly awarded. The Commissioners argue that Sec. 1988 does not authorize the recovery of fees for collection efforts. The application of such a principle to the present case would destroy the policy behind Sec. 1988. The relevant language in 42 U.S.C. Sec. 1988 states: "In any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." In Balark v. Curtin, 655 F.2d 798 (7th Cir.1981), the court wrote:
 
 
 61
 Congress has determined that attorneys' fees are necessary to fulfill the purposes of the civil rights laws by transferring the costs of litigation to those who infringe upon basic civil rights. The compensatory goals of the civil rights laws would thus be undermined if fees were not also available when defendants oppose the collection of civil rights judgments. An award of compensation for injuries sustained as a result of unconstitutional state action would be "diluted" if fees were denied to plaintiffs required to contest substantial efforts to resist or obstruct the collection of civil rights judgments. The victory would be hollow if plaintiffs were left with a paper judgment not negotiable into cash except by undertaking burdensome and uncompensated litigation.
 
 
 62
 Id. at 803 (citation omitted) (emphasis in original).
 
 
 63
 The Commissioners dispute the fee award, relying on Preston v. Thompson, 565 F.Supp. 310 (N.D.Ill.1983), Muscare v. Quinn, 680 F.2d 42 (7th Cir.1982), and Willie M. v. Hunt, 732 F.2d 383 (4th Cir.1984). All are distinguishable. In Preston, the court stated that "[i]t is clear that time spent in collecting a judgment in a civil rights action may be the subject of an award of attorney's fees." 565 F.Supp. at 319. The court granted additional fees for work credited to the appeal, post-appeal, and turnover motions related to the original fee award. Although the court denied one attorney fees for 15.25 hours related to obtaining the additional fees on the original fees, i.e., the fees for obtaining fees related to the original fees, it awarded fees for "postdecision work in the district court" arising from the defendants' suggestions that they would "resist payment" of the award. Id. at 319. The court wrote,
 
 
 64
 At some point, it is evident that compensation for time spent litigating entitlements to attorney's fees for establishing an entitlement to fees is no longer compensable. We think that once plaintiffs have established that they are entitled to attorney's fees and have been granted an award of fees for establishing that entitlement, no further fee awards on the attorney's fees aspect of the case should be allowed.
 
 
 65
 Id. at 320 (emphasis added). Under the court's decision, establishing an "entitlement" to attorneys' fees includes obtaining the assurance that someone actually would pay them. Muscare v. Quinn, 680 F.2d 42 (7th Cir.1982), involved the appropriate standard to use in reviewing a district court's refusal to grant "second-round attorney's fees" and did not focus on the propriety in granting such requests. Id. at 44. Nevertheless, the court concluded, "[o]nly in extraordinary circumstances will we disturb a district judge's exercise of his discretion in awarding or denying fees for establishing fees." Id. at 45 (emphasis added). The decision in Willie M. arose because the "interpretation of this consent judgment was akin to a question of contract interpretation; it was not inextricably intermingled with the original claims in the lawsuit; professional services for conducting this litigation were not compensable under 42 U.S.C. Sec. 1988." 732 F.2d at 386. The present problem does not arise from the Settlement Agreement itself, which could have been enforced had the Sheriff possessed assets; rather it results from the need to decide the question of final policymaking authority--an issue inherently related to Sec. 1983 and Sec. 1988 litigation. See Plyler v. Evatt, 902 F.2d 273, 279-81 (4th Cir.1990) (explaining Willie M.).
 
 
 66
 Fee awards under Sec. 1988 may not be disturbed unless the district court abused its discretion. See Buffington v. Baltimore County, Md., 913 F.2d 113, 130 (4th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991); Ganey v. Garrison, 813 F.2d 650, 652 (4th Cir.1987). The district court did not abuse its discretion in granting attorneys' fees for the inmates' efforts to recover the portion allocated to the Sheriff under the original attorneys' fee award.V.
 
 
 67
 The Dorchester County Sheriff, in managing and operating the County Jail acts in the guise of, in essence, is a county official--he holds the final county policymaking authority over the County Jail. If he is without sufficient funds to satisfy a settled upon fee ordered in a court proceeding, the County properly is required to satisfy his obligation. That responsibility extends to fees awarded which represent attorneys' fees and expenses incurred in seeking collection of the original fee award.
 
 
 68
 AFFIRMED.
 
 
 
 [1]
 At first, it was thought that the Sheriff might, through insurance coverage, meet his portion directly. However, that possibility ultimately evaporated
 
 
 [2]
 The Settlement Agreement stated: "Any petition for said legal fees and costs filed by plaintiff shall be structured so as to specify those fees assessed against the defendant Commissioners and the defendant Sheriff."
 
 
 [3]
 The Commissioners were to pay $22,554.40 ($21,282.55 for attorneys' fees and $1,271.65 for expenses) and the Sheriff was to pay $109,086.97 ($80,138.00 for attorneys' fees and $28,948.97 for expenses). Minor amounts were subsequently added. On May 4, 1989, the judge ordered that the Commissioners pay $927.50 and the Sheriff pay $4,822.50 as a supplemental award of attorneys' fees. On June 8, 1989, the judge ordered costs of $5.12 and $124.12 to be paid by the Commissioners and Sheriff respectively
 
 
 [4]
 Apparently the Commissioners' counsel had threatened a Federal Rule of Civil Procedure 11 bad faith or abuse of process claim if the inmates attempted to file a second garnishment writ. Consequently, the inmates first wrote a letter informing counsel of their intentions
 
 
 [5]
 The order appears to illustrate the not infrequently arising distinction between "initial" and "ultimate." While the County had satisfied the one-fifth of the fees due from it initially, through liability attributed to the Commissioners, the question remained open and was answered by the district judge, as to whether, to the extent the Sheriff should not meet the four-fifths initially assigned to him, the County ultimately would be assessed
 
 
 [6]
 The inmates had requested $41,303.50 in fees and $1,451.42 in costs. The court reduced the request by the portion attributable to the inmates' attempt to disqualify the Sheriff's counsel
 
 
 [7]
 The magistrate judge also stated that the Sheriff was "the Dorchester County official responsible for determining where inmates will be kept in custody." August 19, 1988 Report and Recommendation at 37 (emphasis added)
 
 
 [8]
 We note that the Commissioners have not argued that, if the Sheriff is a county policymaker, he is not the final county policymaker. The district court's decision renders the hypothetical argument untenable. The apportionment decision, in essence, amounted to a conclusion that the Sheriff held final policymaking authority, leaving open only the question, whose authority did he wield
 We emphasize that our conclusions in the instant case do not prevent parties in future cases from arguing that a sheriff's actions leading to alleged violations did not manifest final policymaking authority under City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 923-24, 99 L.Ed.2d 107 (1988). We address only whether, once the sheriff has been found to be the final policymaker for actions regarding the county jail, the sheriff wields county or state authority.
 
 
 [9]
 The Commissioners find article XV, Sec. 2 of the Maryland Constitution significant, mandating suspension from office. Section two, however, applies to "any elected official of the State or of a county or of a municipal corporation" who is convicted of a felony or misdemeanor related to public duties. The language does not distinguish sheriffs from other elected county, city, or state officers
 
 
 [10]
 We refer to the bound compilations of the Code of the Public Local Laws of Maryland which were published in 1888, 1930, 1961, and 1974. The Dorchester County Code appears as article 10. The parties have included an apparently more recent version of the Dorchester County Code. The provisions of the 1974 Code appearing in the opinion are identical to those cited by the parties. We add that "local laws differ from general laws only in that they are confined in their operation to certain prescribed or definite territorial limits...." Cole v. Secretary of State, 249 Md. 425, 433, 240 A.2d 272, 277 (1968)
 
 
 [11]
 Cases in other circuits cited by the Commissioners to support their position that funding is not relevant are distinguishable. For example, in Hendrickson v. Griggs, 672 F.Supp. 1126 (N.D.Iowa 1987), appeal dismissed, 856 F.2d 1041 (8th Cir.1988), the court never addressed whether the county could be bound under the mandatory preliminary injunction; it merely concluded that the county board could not be bound, and the court notably reserved the issue of whether it would bind the county sheriff until the relief requested became apparent. Similarly, in Gross v. Tazewell County Jail, 533 F.Supp. 413 (W.D.Va.1982), the court found the County Board immune for Eleventh Amendment reasons. The Dorchester County Commissioners have not disputed on appeal the district judge's conclusion that the County was not entitled to Eleventh Amendment immunity. In any case, the denial of immunity was proper. See Ram Ditta v. Maryland National Capital Park & Planning Comm'n, 822 F.2d 456, 457 (4th Cir.1987); see also Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979). Moreover, attorneys fees under Sec. 1988 can be recovered despite Eleventh Amendment immunity. See Hutto v. Finney, 437 U.S. 678, 694-700, 98 S.Ct. 2565, 2575-78, 57 L.Ed.2d 522 (1978), reh'g denied, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); McManama v. Lukhard, 464 F.Supp. 38, 42 (W.D.Va.1978), aff'd, 616 F.2d 727 (4th Cir.1980)
 
 
 [12]
 Prior to the establishment of the Commission, the statute governing the "jail programming and inspection officer" who inspected jails for compliance with State standards, stated that the "officer will submit a report to the county commission of the several counties ... showing the results of such inspection together with recommendations...." 1980 Md.Law ch. 535 (repealing Md.Ann.Code art. 27, Sec. 704)
 
 
 [13]
 We note that the district court judge stated that "the facts presented to the Magistrate tended to show long-standing, perhaps extreme indifference to the plight of the inmates.... It was also apparent that the failure to renovate the present jail or to build a new jail was attributable to the commissioners alone, and not to the state." Memorandum Op., November 4, 1988, at 8 (emphasis added)