## In re MOOREHEAD.

[Cite as In re Moorehead (1991), 75 Ohio App.3d 711.]

Court of Appeals of Ohio,
Montgomery County.

Nos. 12667, 12689.

Decided Aug. 23, 1991.

713

*Josie Harr,* Assistant Prosecuting Attorney, for appellee Montgomery County Children Services Board.

*Porter, Wright, Morris & Arthur* and *Denise M. Mirman,* for appellants Robert and Melva Dearth.

*Hunt, Skilken & Wehner* and *David J. Cranmer,* guardian *ad litem,* for appellant Andrea Moorehead.

---

FAIN, Presiding Judge.

Petitioner–Appellants, Melva and Robert Dearth, appeal from the trial court's denial of their motion for permanent custody of Andrea Moorehead, their former foster child, who is presently in the permanent custody of the Montgomery County Children Services Board ("CSB"). The Dearths' appeal was consolidated with the appeal of the guardian *ad litem* for Andrea Moorehead.

The Dearths contend that CSB improperly chose an adoptive home for Andrea solely on the basis of race, in violation of the Equal Protection Clauses of the Ohio and United States Constitutions, and that, in deferring to CSB, the trial court committed an abuse of discretion by failing to consider the best interests of the child. Further, they contend that the trial court improperly adopted the report and recommendation of the referee over their objections without reviewing the evidence. The guardian *ad litem* essentially contends

that the trial court's decision was an abuse of its discretion, because the evidence in the record clearly compelled a decision in favor of the Dearths.

Although we find that there is evidence in the record that would have supported a decision either for or against the Dearths, we conclude that the trial court committed prejudicial error when it failed independently to consider the evidence prior to adopting the referee's report and recommendation. We further conclude that the trial court did not properly exercise its discretion in determining the best interests of Andrea when it deferred to an agency that used race as a determinative factor for selecting Andrea's adoptive home. Accordingly, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

I

Andrea's biological mother used crack cocaine one week prior to Andrea's delivery, and tested positive for a venereal disease at the time of giving birth. The birth mother disappeared and could not be located, and there were no relatives available to care for the newborn child. CSB was granted temporary custody of Andrea.

Nine days after her birth, Andrea was placed with Melva and Robert Dearth, foster parents for CSB. Due to her poor health, the infant was placed on an apnea monitor. The Dearths were instructed as to the techniques of cardiopulmonary resuscitation and the use of an apnea monitor prior to taking Andrea into their home.

In June 1989, when Andrea was ten months old, Melva informed CSB of her desire to adopt Andrea. CSB was given permanent custody of Andrea in July 1989. CSB allegedly discouraged the Dearths and initially denied them an adoption application because the Dearths are white and Andrea is black. CSB claims that the Dearths vacillated in their desire to adopt Andrea because they realized that she is black, rather than biracial, and the Dearths thought it would be better if she were placed in a black adoptive home.

The CSB subsequently asserted additional reasons for its conclusion that the Dearths would not be appropriate parents for Andrea. Racial slurs made by Melva Dearth, poor judgment, poor living conditions and uncleanliness were articulated by CSB as reasons for rejecting the Dearths' home as a possible adoptive home for Andrea. However, CSB was unable to provide written documentation to substantiate these claims. CSB's caseworker testified that her approach was to work directly with the Dearths on problem issues as they arose, rather than to document those problems. CSB subsequently decertified the Dearths as foster parents.

In September 1989, the Dearths filed a motion, pursuant to R.C. 2151.417, for review of the agency's actions and custody of Andrea in the Common Pleas Court of Montgomery County, Juvenile Division. The trial court entered an Interim Order restraining CSB from removing Andrea from the Dearths' home. The Dearths asked the trial court to consider the child's placement and custodial arrangement, to terminate the permanent custody previously granted to CSB, and to grant them legal custody of Andrea.

After months of discovery and psychological evaluations, a hearing was held before a referee. The referee ordered two adoptive home studies on the Dearths and CSB's chosen adoptive family for Andrea. The results of the studies were divided as to who would be best suitable to adopt Andrea. One study approved the Dearths as an adoptive placement for Andrea and did not recommend CSB's choice because Mrs. "P" refused to submit to a standard fingerprint check. The second study did not recommend the Dearths due to Andrea's racial heritage.

The referee denied the Dearths' motion and recommended that Andrea remain in the permanent custody of CSB and that CSB determine who is best suited to adopt. The trial court overruled the Dearths' objections to the report and recommendation and adopted the recommendations of the referee. The Dearths and the guardian ad litem appeal from the judgment of the trial court. An interim order, pending appeal, was secured from this court restraining CSB from removing Andrea from the Dearths' home, and requiring the Dearths to make Andrea available for supervised visitation with CSB's prospective adoptive couple.

## II

We begin by addressing the issues of whether the trial court had jurisdiction to hear the motion for a change of permanent custody filed by the Dearths and whether the Dearths had standing to bring this action.

The Dearths assert that because CSB has failed to cross-appeal, this court is precluded from considering the issues of jurisdiction and standing. However, issues concerning subject matter jurisdiction are not waived and will be considered by a reviewing court, even if objections to the jurisdiction of the subject matter have not been raised in the trial court. *Adkins v. Geyer* (Feb. 26, 1986), Clark App. No. 2107, unreported, 1986 WL 2654. CSB raised the issue of jurisdiction during the initial hearing before this court on the Dearths' motion for stay pending appeal and in its appellate brief presently before this court. Therefore, we will consider the issue of whether the trial court had jurisdiction to hear this case.

R.C. 2151.417 provides, in pertinent part, as follows:

"(A) Any court that issues a dispositional order pursuant to section 2151.-353, 2151.414, or 2151.415 of the Revised Code *may review at any time* the child's placement or custody arrangement, the case plan prepared for the child pursuant to section 2151.412 of the Revised Code, the actions of the public children services agency or private child placing agency in implementing that case plan, and any other aspects of the child's placement or custody arrangement. * * *

"(B) If a court issues a dispositional order pursuant to section 2151.353, 2151.414 or 2151.415 of the Revised Code, *the court has continuing jurisdiction over the child* as set forth in division (E)(1) of section 2151.353 of the Revised Code. The *court may amend a dispositional order* in accordance with division (E)(2) of section 2151.353 of the Revised Code at any time upon its own motion or upon the motion of any interested party." (Emphasis added.)

Andrea Moorehead was adjudged dependent pursuant to R.C. 2151.353 and was subsequently committed to the permanent custody of CSB. Therefore, the trial court retained continuing jurisdiction over her to amend the initial dispositional order and to review her custody arrangement or placement at any time, even on its own motion, so long as the parties receive notice and an opportunity to be heard.

■ CSB contends that because Melva and Robert Dearth were not parties to the original action, and therefore lacked standing, the trial court should have dismissed their motion for review. Because CSB has not cross-appealed, it cannot obtain a modification of the trial court's judgment, which includes a review of Andrea's placement; however, CSB's failure to cross appeal does not prevent it from arguing lack of standing to *preserve* that part of the judgment denying the Dearths relief relating to Andrea's custody. Therefore, we may consider the standing issue in connection with the custody determination.

R.C. 2151.416 and 2151.417 provide the trial court with a wide range of options when exercising its discretion in determining what action should be taken by the court, other individuals or agencies with respect to a child's placement or custody arrangement. The hearing upon the motion for review is treated "as if the hearing were the original dispositional hearing." R.C. 2151.353(E)(2). The trial court is to give all parties to the action, including the guardian *ad litem*, notice of the hearing. R.C. 2151.417(B); 2151.353(E)(2).

■ CSB asserts that because the Dearths did not file a motion for permanent custody prior to the original hearing, they may not now seek custody, relying upon R.C. 2151.353(A)(3). However, we conclude that they

are not *permanently* precluded from filing a motion for review at a later time, because the review hearing is to be treated as if it were an original hearing. The statute contemplates that one not a party to the original action may subsequently seek a review of an agency's plan. The open-ended language of the statute provides for the possibility of subsequently changing the custodial arrangement of a child placed in the permanent custody of an agency. It provides a trial court with the broad authority and discretion necessary to reconsider and to modify a child's custodial arrangement when reviewing the appropriateness of any agency action if to do so would be in the best interest of the child.

For all these reasons, we construe the limitation in R.C. 2151.353(A)(3) as merely providing that the trial court may not award custody of a child to a non-parent who has not sought custody before the hearing resulting in the award. This would be for the obvious reason that if the court should award custody to a custodian who was not within the contemplation of any of the parties as a potential custodian when the custody issue was heard, then the parties will not have had adequate notice of the proposed custodian at the hearing at which the custody issue was considered.

R.C. 2151.417(A) provides, in pertinent part, as follows:

"In conducting the review, the court shall determine the appropriateness of any agency actions, *the appropriateness of continuing the child's placement or custody arrangement,* and whether any changes should be made with respect to the child's placement or custody arrangement or with respect to the actions of the agency under the child's placement or custody arrangement. Based upon the evidence presented at a hearing held after notice to all parties and the guardian ad litem of the child, the court may require the agency, the parents, guardian, or custodian of the child, *and the physical custodians of the child to take any reasonable action that the court determines is necessary and in the best interest of the child* or to discontinue any action that it determines is not in the best interest of the child."

R.C. 2151.417(F) provides, in pertinent part, as follows:

"After the review hearing, the court shall take the following actions based upon the evidence presented:

"(1) Determine whether the conclusions of the administrative review are supported by a preponderance of the evidence and approve or modify the case plan based upon that evidence;

"* * * *

"(3) If the child is in permanent custody, determine what actions are required by the custodial agency and of *any other organizations or persons*

in order to facilitate an adoption of the child and *make any appropriate orders with respect to the custody arrangement or conditions of the child, including, but not limited to,* a transfer of permanent custody to another public children services agency or private child placing agency[.]"

R.C. 2151.416(G) provides:

"The juvenile court that receives the written summary of the administrative review, upon determining, either from the written summary, case plan, or otherwise, that the custody or care arrangement is not in the best interest of the child, *may terminate the custody of an agency* and place the child in the custody of another public or private organization, society, association, agency, or individual certified pursuant to sections 5103.02 and 5103.03 of the Revised Code." (Emphasis added.)

■ The foster parents of a child in the permanent custody of an agency are able to provide the trial court with insight and information concerning a child and the progress of his case plan. The semiannual administrative reviews of a child's case plan required under R.C. 2151.416 specifically provide that foster parents must be given an opportunity to submit written information to be included in the child's case record. Because the relevant Ohio statutes are drafted in broad terms, this enables a trial court to make a determination from a wide range of evidence presented concerning a child, including information provided by foster parents. This furthers the principle of determining the best interests of a child in custody cases and focuses upon the welfare of the child.

It is appropriate that the Dearths, as foster parents charged with the daily responsibility for Andrea's welfare, could seek a review of CSB's actions regarding the long-term plan for the child. When the Dearths filed their motion for review in September 1989, they were certified CSB foster parents. R.C. 2151.416(G) gives the trial court, during an administrative review, the option of placing a child in the custody of an individual certified pursuant to R.C. 5103.02 and 5103.03 if it determines that to do so would be in the best interests of the child. An administrative review may proceed to a court hearing under R.C. 2151.417. The range of dispositions possible after a *hearing,* pursuant to R.C. 2151.417(F)(3), is open-ended; it includes any appropriate order with respect to the custody arrangement of the child. When the trial court has held a hearing concerning the welfare of the child, and has satisfied itself as to the ability of the proposed custodian to take care of the child, it is not limited to certified custodians, as it is in the case of dispositions, without a review hearing, made pursuant to R.C. 2151.416.

We reject CSB's contention that R.C. 2151.417 was enacted only to monitor the actions of an agency. If a trial court did not have the authority to order a

removal of custody from an agency if warranted under the circumstances, then an agency would not be subject to any meaningful review process. Finally, we reject CSB's contention that to accord foster parents the right to seek review under R.C. 2151.417 would be to permit continual attacks upon the agency and to undermine a prompt and efficient system of adoption. To permit a foster parent under these circumstances the opportunity to seek a review of an agency's action furthers the best interests of the child by providing a meaningful review of alleged questionable agency actions. An R.C. 2151.417 review is the only forum available to contest or question an agency action.

In its parade of horribles that would attend a contrary decision on the standing issue, the CSB has argued that to construe the statute broadly would permit virtually anyone to move for custody and then appeal an adverse result, thereby tying up the adoption process for a substantial period of time. At first thought, this is a strong argument. Upon closer consideration, however, we are persuaded that if an individual is concerned enough about the welfare of a child to go through the process of notice and hearing pursuant to R.C. 2151.417, and then to appeal from an adverse result, then that individual probably *should* be heard. Under those circumstances, the individual has demonstrated a strong interest in the welfare of the child by virtue of his or her pursuit of complex litigation.

Based upon the particular facts presented in this case, we conclude that Melva and Robert Dearth had standing to seek a review by the trial court of the agency's actions regarding the placement and custody of Andrea Moorehead.

To facilitate our analysis, we consider first the Dearths' third assignment of error.

### III

Melva and Robert Dearth's third assignment of error is as follows:

"It was improper for the court to adopt the report and recommendation of the referee where objections to same have been filed and the court had not reviewed the evidence in the case."

Montgomery County Rules of Practice and Procedure for Domestic Relations and Juvenile Courts provide:

"When a transcript of proceedings before a referee is ordered for the court's consideration in ruling upon objections to a referee's report, the objections, or the memorandum in support thereof, shall state that a transcript of the proceedings before the referee has been ordered. (See Loc.R.

2.51[f] of the Rules of Court.) Failure to so state may cause the court to rule upon the objections as if no transcript has been ordered or furnished.

"The transcript must be ordered within three days of the filing of objections. See Loc.R. 2.51(f). It is the responsibility of counsel to make the request directly of the court reporter and to make the arrangements for payment of the transcript. Failure to make payment as required, may cause the court to rule upon the objections without the transcript." Loc.R. 4.18.

■ A trial court may adopt any finding of fact in the referee's report without further consideration, unless objections thereto have been filed and relevant portions of the transcript from the hearing support the objections. Civ.R. 53(E)(6) and Juv.R. 40(D)(6). Referees serve only in an advisory capacity and have no authority to render final judgments. *Nolte v. Nolte* (1978), 60 Ohio App.2d 227, 14 O.O.3d 215, 396 N.E.2d 807, paragraph two of syllabus. Therefore, when objections based on the sufficiency or weight of the evidence are filed to a referee's report and recommendations and a transcript is ordered, a trial court does not have the discretion to overrule the objections and to adopt the referee's report without reviewing and considering the transcript.

In this case, the referee filed his report and recommendation on January 18, 1991. The Dearths filed their objections to the report and recommendation of the referee on February 1, 1991. The trial court received notice in the objections that a transcript of the proceedings had been ordered. The record reveals that the Dearths ordered a transcript and paid a deposit of $600 on January 24, 1991, prior to filing the objections. Three days after the objections were filed and prior to receiving a transcript, the trial court filed its entry and order adopting the referee's report and recommendation.

■ The Dearths complied with the requirements of Loc.R. 4.18 by ordering a transcript, filing objections to the referee's report, and notifying the trial court in the objections that a transcript had been ordered. It is proper for the objecting party to include a request for the transcript in the objections to the referee's report. *Eash v. Eash* (1984), 14 Ohio App.3d 298, 14 OBR 355, 471 N.E.2d 174.

■ In their objections, the Dearths asserted that the report and recommendation of the referee was not supported by the evidence presented during the hearing and that it was against the manifest weight of the evidence. A transcript of proceedings is required for the court to rule on the merits of a party's objections when they are based on the manifest weight of the evidence. A review of the transcript is required for resolution of manifest weight questions. *Id.* at 299, 14 OBR at 356, 471 N.E.2d at 176. Therefore,

the trial court erred when it failed to review and to consider the transcript prior to adopting the report and recommendation of the referee. We conclude that the trial court must consider the Dearths' objections in light of the transcript of proceedings before the referee.

The Dearths' third assignment of error is sustained.

## IV

The Dearths' first and second assignments of error are as follows:

"It is a violation of the Equal Protection Clauses of the Ohio and United States Constitutions to refuse to place a child with a family for a permanent adoption on the basis of racial considerations.

"It is improper for an agency to refuse to place a child for adoption due to race considerations where such an adoption would otherwise be in the best interest of the child."

When reviewing a child's placement status, the trial court must determine whether the conclusions of the administrative review are supported by a preponderance of the evidence and approve or modify the case plan based upon the evidence presented. R.C. 2151.417(F)(1). For a child in the permanent custody of an agency, the trial court then must determine what is necessary to facilitate an adoption of the child and make the appropriate orders to further the adoption process. R.C. 2151.417(F)(3). Therefore, we must consider whether the trial court abused its discretion when it approved and deferred to CSB's administrative determination, which, pursuant to CSB's existing policy and contrary to law, relied upon racial considerations to a constitutionally impermissible extent.

A trial court's discretion in determining the best interests of a child is broad; but it is subject to reversal upon a showing of an abuse of discretion. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849, citing *Dailey v. Dailey* (1945), 146 Ohio St. 93, 32 O.O. 29, 64 N.E.2d 246; *Trickey v. Trickey* (1952), 158 Ohio St. 9, 47 O.O. 481, 106 N.E.2d 772. An "abuse of discretion" is defined as more than an error of law or judgment. It is an unreasonable, arbitrary or unconscionable attitude of a court. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172, 404 N.E.2d 144, 148; *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142. Furthermore, a reviewing court should be guided by the presumption that the findings of the trial court are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

In its judgment entry, the trial court approved CSB's case plan for Andrea and found that CSB should proceed with the permanent plan of choosing an adoptive home and facilitate the adoption of Andrea. However, the trial court had previously found that CSB committed an inappropriate act in failing to consider the Dearths as adoptive parents for Andrea and that it was inappropriate for CSB not to order an adoptive home study of the Dearths. The trial court ordered the CSB to consider the adoptive home studies that the court had already obtained, in deciding where to place Andrea for adoption.

Evidence was presented by CSB alleging that racial slurs by Mrs. Dearth, poor judgment, various inabilities in caring for children, uncleanliness and psychological reports all indicated that the Dearths would not be the best choice for Andrea's adoptive home. The referee found that CSB raised genuine issues regarding the ability of the Dearths as adoptive parents, although he noted that these issues had not been raised by CSB until the Dearths had made it clear that they intended to challenge the CSB's decision to place Andrea for adoption by another couple.

The Dearths presented evidence of the bonding that had occurred between their family and Andrea. They live in an interracial neighborhood, and they attend an interracial church and interracial schools. They have two natural children and a stable marriage, as well as a steady family income. Mrs. Dearth denied making any racial slurs.

The Dearths assert that because the referee found that CSB's evidence was not credible, the only credible evidence presented was that of the Dearths and, therefore, the trial court was bound by the referee's credibility determination. A trial judge has an independent duty to determine disputed issues of fact. He may not delegate this duty to a referee. If the trial judge finds that he is able to resolve conflicts in the testimony from the printed record, he may do so; if not, he may take additional testimony himself. Civ.R. 53(E)(2).

Our review of the referee's report and recommendation has failed to reveal that the referee found that CSB's evidence was not credible. Therefore, we reject the Dearths' contention that the trial court was bound to accept only the Dearths' version of the evidence.

From our review of the evidence, we cannot say that reasonable minds can only reach one conclusion—in favor of the Dearths. Therefore, we conclude that the trial court could have reached a conclusion either way upon the ultimate issue before it—whether Andrea's interests would be better served by the adoption proposed by CSB, or whether her interests would be better served by awarding her legal custody to the Dearths, preparatory to her adoption by them.

 Normally, the foregoing conclusion would dispose of an abuse of discretion claim. However, in this case there is clear evidence that CSB had a policy of placing black children with black adoptive parents (if a black couple could be found), and that the CSB's decision in this case was pursuant to that policy. For the reasons that follow, we conclude that CSB's policy of restricting the adoption of black children in its custody to black couples violated the Equal Protection Clauses of the Ohio and federal Constitutions. We conclude that race may be a factor in adoption placements, and the trial court may consider race as a factor, along with other factors, in determining the best interests of the child. However, in this case it is clear from the record that the trial court has deferred to an agency determination that was predicated upon a policy that relied upon race to an impermissible extent. Under the circumstances, the strict scrutiny that courts are required to exercise concerning racial classifications requires that the trial court make its own independent determination of Andrea's best interests, without deference to the CSB.

 Cultural heritage is one factor among many that may be considered in selecting an adoptive home for a child. However, race can never be the sole factor in deciding the best interests of the child. *McLaughlin v. Pernsley* (E.D.Pa.1988), 693 F.Supp. 318, 324; *Drummond v. Fulton County Dept. of Family & Children's Services* (C.A.5, 1977), 563 F.2d 1200, 1205; *In re Adoption of Minor* (C.A.D.C.1955), 228 F.2d 446, 448. Racial classifications are "subject to the most exacting scrutiny" because race-based classifications are inherently suspect. *Palmore v. Sidoti* (1984), 466 U.S. 429, 432, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421, 425; *McLaughlin v. Pernsley, supra,* at 324.

The difficulties inherent in interracial adoption justify consideration of race as a relevant factor in adoption, but do not justify race as being the determinative factor. *Compos v. McKeithen* (E.D.La.1972), 341 F.Supp. 264, 266. The effects of racial prejudice, the reality of private biases and the possible injury they might inflict are not permissible considerations, nor can they justify racial classification. *Palmore, supra,* 466 U.S. at 433, 104 S.Ct. at 1882, 80 L.Ed.2d at 425. The use of race as the sole basis of an adoptive choice is inappropriate and inadequate. *McLaughlin, supra,* at 324.

There may be reasons why a difference in race is relevant in adoption proceedings; however, the factor of race, alone, cannot be decisive in determining the child's welfare. *Compos, supra,* at 267, citing *In re Adoption of a Minor, supra.* A court cannot ignore other relevant considerations which may have controlling weight. The factor of race alone cannot outweigh all other considerations and be the determinative or decisive factor. In other

words, considerations of race may not dominate the decision to the exclusion of other considerations. *Drummond, supra,* at 1204.

Factors such as the ability of an individual, black or white, to care for a child, to provide a safe, secure and stable home for the child and the ability to adequately provide for a child's racial and cultural needs must also be considered. An additional factor is the racial attitudes of the prospective couple and whether they could instill and foster a positive sense of racial identity. Adoption determinations should be decided on the individual merits of each case, without using race as an absolute determining factor.

The Fifth Circuit Court of Appeals has opined that:

"A couple has no right to adopt a child it is not equipped to rear, and according to the professional literature race bears directly on that inquiry. From the child's perspective, the consideration of race is simply another facet of finding him the best possible home. Rather than eliminating certain categories of homes from consideration it avoids the potentially tragic possibility of placing a child in a home with parents who will not be able to cope with the child's problems.

" * * *

"[A]doption agencies quite frequently try to place a child where he can most easily become a normal family member. The duplication of his natural biological environment is a part of that program. Such factors as age, hair color, eye color, and facial features of parents and child are considered in reaching a decision. This flows from the belief that a child and adoptive parents can best adjust to a normal family relationship if the child is placed with adoptive parents who could have actually parented him. To permit consideration of physical characteristics necessarily carries with it permission to consider racial characteristics. This Court does not have the professional expertise to assess the wisdom of that type of inquiry, but it is our province to conclude, as we do today, that the use of race as one of those factors is not unconstitutional." *Drummond, supra,* at 1205–1206.

In our case, the written documentation in the record reveals that CSB's initial reason for denying the Dearths an adoption application was based on nothing more than the fact that the Dearths are white and Andrea is black. Prior to the summer of 1989, at which time the Dearths showed an initial interest in adopting Andrea, CSB had no documentation of complaints with the care the Dearths were providing to the many foster children placed in their home. In April 1989, the Dearths received high marks by CSB and were recertified as foster parents. In July 1989, a caseworker noted in a memo following a visit to the Dearth home that allegations of racial slurs by Mrs.

Dearth could not be substantiated. CSB chose not to recertify the Dearths as foster parents in April 1990.

CSB documents indicate that the agency's policy is to place children with adoptive parents of the same cultural heritage as the child. A note of a meeting with the Dearths in August 1989, reflects that Mrs. Dearth was told that the reason she could not adopt Andrea was on account of "the obligation of the agency to pursue families as close culturally to the birth family as possible." The same note indicates that Mr. Dearth expressed his intention to fight CSB because "he felt race was the issue and he didn't believe that was fair."

A CSB memo dated October 4, 1989, is worth quoting at some length:

"The above named child's case was transferred to Adoption on July 27, 1989. At the adoption transfer conference on August 4, 1989 the former caseworker, Chris Mulcahy, shared that Andrea, upon birth and for some time afterward, child had a very light complexion, which made her appear bi-racial. Mrs. Dearth also had received some questionable information pertaining to Andrea's parentage. It is felt that these circumstances possibly influenced the previous caseworker and Mrs. Dearth to consider that this child would be appropriate for them to keep. However, by the time this conference was held, Andrea's skin color had deepened considerably and Chris Mulcahy and the Agency identified this child as black. At the conference, Ms. Mulcahy stated she felt child should be placed with a black family, but she did indicate foster parents' interest in adoption.

"On August 7, 1989, I visited the Dearth home, met Andrea and discussed with Mrs. Dearth our plan to place Andrea with a Black family as soon as one was identified and that we were currently reviewing homestudies. Mrs. Dearth was not accepting of this plan, as she repeatedly said she wanted to keep Andrea. Mrs. Dearth was told that we wanted to place Andrea with a Black couple so that she could grow up in the same racial and cultural environment. Mrs. Dearth either was unwilling or unable to understand the importance or significance of this reasoning. She continually contacted by phone several Adoption staff (Jacky Brown and Donna Key) expressing her interest in adopting Andrea. She was consistently given the same information about Andrea's placement. * * * "

From the foregoing memorandum, an internal CSB memo not addressed to the Dearths, it is clear that Andrea's chances of being adopted by the Dearths vanished along with her light complexion. As long as the child was regarded as bi-racial, she was regarded as "appropriate for * * * [the Dearths] to keep." Once the child was revealed as being black, the Dearths were not to be considered. That this was an internal memorandum is significant, because

the CSB now contends that there were other reasons, not having to do with race, for discounting the Dearths, but that the Dearths were told only that they were of the wrong race, because that would be less unpleasant for the Dearths to hear.

We agree with the referee's observation that CSB had no documentation of the Dearths' alleged deficiencies until after the Dearths had made it clear that they intended to fight for Andrea. The memorandum of October 4, 1989, is compelling evidence that the CSB, at least initially, predicated its decision to find a black couple for Andrea exclusively upon racial grounds.

Additional evidence that the CSB's decision was based almost entirely upon race can be found in the cross-examination testimony of CSB workers Ann Williams and Jaclyn Brown. Williams admitted that "the primary purpose of * * * [the CSB] in placing a child is to maintain the child's familial, social and cultural ties," and that "we try to match the black child with the black couple." Brown testified as follows:

"Q. * * *. Would it be fair to say the agency's position in general was not all the situations and all the inspections that you have had [evidently referring to the Dearths' alleged deficiencies]—you had a black family and the agency was to put those together?

"A. That's correct."

CSB's actions in the placement of Andrea Moorehead for adoption are inherently suspect. The evidence presented supports the Dearths' contention that at least initially race was the sole factor upon which CSB refused to consider them as possible adoptive parents for Andrea Moorehead. As a matter of general policy, CSB would never recommend the Dearths as adoptive parents for Andrea, solely because of race. CSB's policy of placing black children with black parents and white children with white parents without considering the many other factors that affect an adoption selection is contrary to law.

Because CSB used a racial classification for adoption placement, we conclude that the trial court must review CSB's actions with strict scrutiny. The requirement of strict scrutiny is inconsistent with the extent to which the trial court, in this case, deferred to the CSB's determination. The referee initially ordered adoptive home studies by two independent agencies in an effort to determine which home would be better for Andrea. When these studies reached diametrically opposing conclusions, the referee deferred to the CSB's determination in the matter, holding that: "[T]his Court does not feel at this time that it needs to overrule or to interpose the Court's judgment over that of the Children Services Board, the agency who is required by law to make these types of determinations."

Significantly, the agency that reached a conclusion adverse to the Dearths, the Lutheran Social Services Agency, based that conclusion exclusively upon the fact that the Dearths, unlike the other couple, were not of the same race as Andrea.[1]

The trial court adopted the referee's report and recommendation. In doing so, the trial court effectively deferred to the CSB's determination. It is ordinarily appropriate for a trial court to defer to a determination by an administrative agency when that determination is within the agency's sphere of expertise. However, where a racial classification has been used by the agency in making the determination, the requirement of strict scrutiny limits the extent of the deference to be accorded. Where, as here, the agency has relied upon a policy that uses racial considerations to a constitutionally impermissible extent, it is inappropriate for the trial court to give the agency's determination any deference at all.

Given the history of this case, the trial court must make its own determination of Andrea's best interests; the trial court can and should consider race as one factor, among many, but it must not defer to the CSB in making its determination.

The Dearths' first and second assignments of error are sustained, in part, to the extent that we conclude the trial court erred in approving CSB's permanent plan for Andrea by deferring to an agency's administrative determination that was based upon a racial classification to an impermissible extent. This cause is remanded to the trial court for reconsideration of Andrea's custody arrangement and best interests from the evidence presented and any other additional evidence that the trial court may find necessary, without giving deference to the CSB's administrative determination.

## V

The guardian *ad litem*'s sole assignment of error is as follows:

"The court erred when it failed to properly consider the requirements of Section 2151.417 of the Ohio Revised Code in that the decision is against the manifest weight of the evidence, was not in the best interest of the child, and was an abuse of discretion."

Essentially, the guardian *ad litem* argues that the trial court's decision was an abuse of its discretion based upon the evidence that was before the court. In other words, he argues that the evidence before the court clearly required a

---

1. Neither adoptive home study is in our record. However, the CSB does not dispute the Dearths' contention, in their brief, that the conclusion of the Lutheran Social Services Agency was based solely upon race.

decision in favor of the Dearths. From our review of the record, there is evidence to support a decision either way as to Andrea's best interests. Accordingly, we reject the guardian *ad litem*'s argument.

## VI

All of the Dearths' assignments of error having been sustained, at least in part, the judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings consistent with this opinion. Upon remand, the trial court should make a determination of this child's best interests, without deference to the CSB's determination. Race may be used as a factor in making that determination, but only as one factor among many; it may not predominate to the exclusion of other considerations. The trial court's attention is directed to *Petition of R.M.G.* (D.C.App.1982), 454 A.2d 776, 791–792, which provides a good explanation of the extent to which racial considerations may properly be taken into account in cases of this kind.

*Judgment reversed*
*and cause remanded.*

BROGAN and GRADY, JJ., concur.