**Victor DeWEES and Mary Jane DeWees**

**v.**

**Wayne T. STEVENSON, Director, Chester County Children and Youth Services; Kay Thalheimer, Adoption Supervisor, Chester County Children and Youth Services; Chester County Children and Youth Services.**

Civ. A. No. 91–7017.

United States District Court,
E.D. Pennsylvania.

Nov. 22, 1991.

Samuel C. Stretton, West Chester, Pa., for plaintiffs.

Guy A. Donatelli, Lamb, Windle & McErlane, P.C., West Chester, Pa., for defendants.

## MEMORANDUM

WALDMAN, District Judge.

Plaintiffs seek to enjoin defendants from refusing to consider plaintiffs as adoptive parents for their foster child, Dante Kirby, and from taking him from the foster home on November 23, 1991 to participate in a National Adoption Center event to attempt to find prospective adoptive parents. Plaintiffs allege that defendants have refused to consider plaintiffs' request to adopt Dante because of their race and in so doing have violated the equal protection and due process guarantees of the Fourteenth Amendment. Plaintiffs also seek a declaration that defendants alleged refusal to consider plaintiffs as adoptive parents violates these Constitutional guarantees.

The court provided an opportunity for hearing and argument on November 20, 1991. At that time, all parties expressed their preparedness and desire to combine proceedings on the requests for temporary and permanent injunctive relief. From the record adduced on November 20, 1991, the court makes the following findings of fact and conclusions of law.

## I. FINDINGS

Plaintiffs are a white couple who have been married for 27 years and who reside in Royersford, Pennsylvania in an almost exclusively white area.

Mrs. DeWees is a high school graduate and housewife.

Mr. DeWees is the maintenance manager for a trucking company.

Plaintiffs have three natural children, ages 26, 23 and 21 years, and five grandchildren for whom they have cared.

Defendants are the Chester County, Pennsylvania Children and Youth Services Agency (CCCYS), its director and its adoption supervisor, Kay Thalheimer.

In January of 1988, plaintiffs applied to CCCYS to be foster parents.

During the ensuing review and evaluation process, Mrs. DeWees stated that she did not want to take any black foster children because "[she] did not want people to think that [she] or her daughter were sleeping with a black man." According to Mrs. DeWees, she gave this reason because she was reluctant to give her real reason which was her concern that she would not know how to take care of a black child.

Plaintiffs requested for placement children under three years of age because they felt they "couldn't deal with children after three years old."

CCCYS approved plaintiffs as foster parents and entered into a foster parents agreement with them on May 9, 1988. The agreement provides, *inter alia*, that CCCYS shall have all responsibility for planning for any foster child.

Pursuant to the agreement, CCCYS variously placed seven foster children with plaintiffs. They were from two to twenty months in age. Three were black and two were bi-racial.

Plaintiffs never received any complaints from CCCYS about their care of any foster child. Plaintiffs' attitude about black children changed and they came "to accept them as any other child."

On November 10, 1989, CCCYS placed Dante Kirby, then two months old, with plaintiffs. Since August 20, 1991, Dante is plaintiffs' only remaining foster child.

Plaintiffs understood that Dante's placement with them was not permanent. On three different occasions Dante was to be returned to his parents, but it did not work out as planned.

Dante's mother is white and his father is black. On November 12, 1991, with their consent, their parental rights were terminated by the Chester County Court of Common Pleas.

Plaintiffs have cared well for Dante. They provide him with his own room and interact frequently with him. He plays and interacts well with plaintiffs' grandchil-

dren. They have supplemented the amounts provided by CCCYS for clothing and toys, and have provided Dante with medical care for his respiratory problems. There clearly is a bond of mutual affection between plaintiffs and Dante.

On June 13, 1991, after being advised by Dante's caseworker that Dante's mother and father intended to relinquish their parental rights, plaintiffs wrote to defendant Thalheimer to express an interest in adopting Dante.

On July 18, 1991, defendant Thalheimer met with and interviewed plaintiffs for an hour and a half, and then referred them to Dr. Joseph Crumbley for further evaluation of their request to adopt Dante.

On August 22, 1991, Dr. Crumbley interviewed plaintiffs at his office in Philadelphia for approximately two hours. Dante was present.

In assessing plaintiffs' ability to raise and socialize a bi-racial child, Dr. Crumbley utilized the Workers' Assessment Guide for Families Adopting Cross–Racially and Cross–Culturally of the U.S. Department of Health and Human Services.

Ms. Thalheimer is a social worker with 20 years of experience in the field of adoption. She has experience with trans-racial adoptions. She has placed bi-racial children with white, black and bi-racial adoptive parents respectively. She is white.

Dr. Crumbley is a family therapist and consultant with a Ph.D. in social work. He is a consultant to three adoption agencies and among his areas of specialization are child abuse, foster care and adoption. He has experience with trans-racial adoptions. He is black.

Dr. Crumbley forwarded an evaluation and recommendation to Ms. Thalheimer on September 11, 1991. He concluded that although Dante was emotionally attached to plaintiffs, they would not be appropriate adoptive parents.

That a foster child has bonded with his foster parents is viewed by professionals as strong evidence that he would bond with new adoptive parents as well.

Dr. Crumbley was concerned about plaintiffs' responses that race had "no impact" on developing a child's identity and self-esteem, that addressing racial issues was not important in raising a minority child; and, that they would not prepare Dante to deal with racial discrimination but rather would address the problem if and when it occurred. He was also concerned about plaintiffs' lack of friends in and contact with the minority community, and Mrs. DeWees' statement that she would "not manufacture black friends."

Dr. Crumbley concluded that plaintiffs lacked the ability to: be sufficiently sensitive to the needs of a bi-racial child during the critical period of socialization, self-identification and personality development of age two through six years; educate a minority child about prejudice and provide him with the skills effectively to respond to it; and, provide positive bi-racial and minority role models through interaction with the minority community.

Based on her interview and Dr. Crumbley's report, Ms. Thalheimer concluded that plaintiffs lacked the sensitivity to racial issues and inter-racial network of community resources needed properly to raise Dante. She decided not to grant plaintiffs' request to adopt Dante, and so advised them by letter of September 26, 1991.

Since receiving this letter, plaintiffs have a greater realization of the importance of the issues identified by Dr. Crumbley and are willing to undertake any course of action recommended by defendants to prepare to address the needs of a bi-racial child. They are willing to "grow and learn." They have located and are prepared to participate in a support group of trans-racial adoptive families.

In Dr. Crumbley's opinion, the only evidence adduced on the point, plaintiffs could learn to address Dante's race-related psychological and social needs with appropriate counseling, education and training but this would take a substantial period of time and Dante is now at a "critical" point.

The court has no expertise in the area of cross-racial adoption. Nevertheless, the court cannot accept Dr. Crumbley's view

that generally only whites with extensive specialized training or who have experienced discrimination themselves will be able adequately to address the needs of a minority child in his or her formative years.

The court does find that particular sensitivity, awareness and skills are necessary for a successful trans-racial adoption of a young child, and that Dr. Crumbley based his recommendation on his conclusion that plaintiffs had not demonstrated those qualities and could acquire them only over a long period.

Ms. Thalheimer did not refuse to consider plaintiffs as adoptive parents because of race or any other reason. Rather, she did consider plaintiffs' request to adopt Dante and decided not to grant it. Ms. Thalheimer is currently prepared to place Dante for adoption with any suitable couple, regardless of race, who appear to her to have the awareness, sensitivity and skills to address adequately the needs of a bi-racial child in his formative years. Her decision was based on the perceived best interests of the child, and not on the color of plaintiffs' skins.

## II. CONCLUSIONS OF LAW

To sustain their due process claim, plaintiffs must show that they are being deprived of a federally secured right by persons acting under color of state law. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978); *Cohen v. City of Philadelphia*, 736 F.2d 81, 83 (3d Cir.1984), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).

Defendants are clearly acting under color of state law.

■ Foster parents do not have a cognizable liberty interest in maintaining a relationship with a foster child vis-a-vis prospective adoptive parents, particularly where the relationship is based on a contract under which the state retains responsibility for the child and places him in a foster home on a temporary basis. *Kyees v. County Dep't. of Public Welfare*, 600 F.2d 693, 694 (7th Cir.1979); *Drummond v.*

*Fulton County Dept. of Family and Children's Services*, 563 F.2d 1200, 1207 (5th Cir.1977), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); *Sherrard v. Owens*, 484 F.Supp. 728, 742 (W.D.Mich.1980), *aff'd*, 644 F.2d 542 (6th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). *See also Spielman v. Hildebrand*, 873 F.2d 1377, 1384 (10th Cir.1989).

■ The essence of the equal protection clause is a requirement that similarly situated people be treated alike. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921, 932 (5th Cir.1988); *Gobla v. Crestwood School District*, 609 F.Supp. 972, 978 (M.D.Pa.1985).

■ Racial classifications are inherently suspect and can survive an equal protection challenge only if they are necessary to achieve a compelling state interest. *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964).

■ The state's responsibility to protect the best interests of a child in its custody is a compelling interest for purposes of the equal protection clause. *McLaughlin v. Pernsley*, 693 F.Supp. 318, 324 (E.D.Pa. 1988), *aff'd*, 876 F.2d 308 (3d Cir.1989).

■ Because of the potential difficulties inherent in a trans-racial adoption, a state agency may consider race and racial attitudes in assessing prospective adoptive parents. *Drummond*, 563 F.2d at 1204. *See also* 55 Pa.Code § 3350.12(c)(3).

■ While the degree of plaintiffs' sensitivity and attitudes about racial issues may be related to their race and experience as whites in a white majority society, defendants refused their request to adopt a minority child because of perceptions about their attitudes and not their race. To the extent that perceived attitudes about race and coping with race-related problems motivated defendants' decision, this was Constitutionally permissible in determining the

best interests of a young child eligible for adoption.

Plaintiffs have failed to establish on the record adduced and under applicable legal precedent and principles that their due process or equal protection rights have been violated.

### III. CONCLUSION

The court has not found that plaintiffs are in any way unfit or could not acquire the knowledge and skills necessary to provide for Dante's future needs. Foster parents play a vital role in our society. They provide a welcome alternative to institutionalization of children without parents able or willing to care for them while the permanent placement process ensues.

State agencies have a moral obligation to be sensitive to the position of foster parents who, particularly with extended placements, are likely to develop emotional bonds to the children placed in their homes. Ultimately, however, the state's responsibility to protect and pursue the best interests of children in its custody must take precedence.

This court is not empowered to sit as a super adoption agency review board. The court thus is not passing upon the wisdom of defendants' actions but only on whether they were motivated by Constitutionally impermissible considerations of race. The court has found that defendants made a considered judgment based on professional input and Constitutionally permissible factors.

This finding turns on the importance of awareness of and sensitivity to issues of race in the context of a trans-racial adoption. These factors, in turn, are important largely because of the realities of the larger society in which we live.

As the court stated at the hearing on November 20, 1991, it is concerned that the very problems which give rise to race-related concerns may unintentionally be exacerbated by overemphasizing them. It is difficult to make race irrelevant, as it should be, if adoption and other social decisions are driven by racial considerations, however benign.

In making adoption decisions, state agencies cannot ignore the realities of the society in which children entrusted to them for placement will be raised, or the affect on children of those realities as documented by professional studies. The court would hope, however, that these agencies also will be mindful of the possibility that an overemphasis on racial issues may retard efforts to achieve a color blind society, and of the need to avoid even the appearance that an adoption decision may have been based on race *per se*.

An order consistent with the foregoing Memorandum will be entered.

### ORDER

AND NOW, this 22nd day of November, 1991, after hearing and argument in the above case and consistent with the accompanying Memorandum containing pertinent findings of fact and conclusions of law, IT IS HEREBY ORDERED that plaintiffs' Motion for Preliminary Injunction is DENIED.

IT IS FURTHER ORDERED, pursuant to the agreement of the parties to proceed simultaneously on November 20, 1991 to adjudicate plaintiffs' claim for permanent injunctive and equitable relief, that JUDGMENT in the above case is entered in favor of defendants and against plaintiffs.