646 A.2d 1036

**In re ADOPTION/GUARDIANSHIP NO. 2633 IN THE CIRCUIT COURT FOR WASHINGTON COUNTY.**

**No. 1638, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Sept. 2, 1994.

Earl W. Bartgis, Jr. (Conrad W. Varner and Miles & Stockbridge, on the brief), Frederick, for appellants.

Shelly E. Mintz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kathy F. Crosby, Staff Atty. on the brief for appellee, WCDSS, Baltimore, MD, James W. Stone, Miller, Oliver, Beachley & Stone on the brief for appellees, John S. and Frances S., Hagerstown, and Alex Bognar on the brief for Tiffany R., Hagerstown), for appellees.

Argued before WENNER, HARRELL and MURPHY, JJ.

HARRELL, Judge.

This consolidated adoption and civil rights appeal arose following the denial of a petition for adoption of an African–American toddler, Tiffany R., filed by a Caucasian couple, Michael and Sylvia Mauk, appellants and Tiffany R.'s former foster parents, in the Circuit Court for Washington County (Moylan, J.). The circuit court followed the recommendations of the Washington County Department of Social Services (WCDSS or the Department), appellee and legal guardian of Tiffany R., and entered an adoption decree in favor of an African–American couple, John and Frances S., also appellees, who, at the time of the proceedings, already had custody of Tiffany R.'s two older brothers.

## STATEMENT OF THE CASE

In July 1990, Tiffany R. was removed from the home of her biological mother by the WCDSS and placed with the Mauks. One of her two older siblings, Rodney, was placed with the S. family. Her other brother, Justin R., was placed in another foster home. On 27 September 1990, the WCDSS petitioned the Circuit Court for Washington County to designate all three R. children as Children In Need of Assistance (CINA). The circuit court granted the petition and committed them to the custody of the WCDSS. Each of the R. children remained in separate foster care homes until August 1991 when the WCDSS reunited Justin with Rodney in the S. home.

On 13 December 1991, the WCDSS filed a petition for a Final Decree of Guardianship over the R. children with the right to consent to adoption or long term care short of adoption, which the circuit court granted on 23 June 1992. Accordingly, David A. Engle, the Director of the WCDSS, was appointed guardian of the R. children, including Tiffany.

Following the granting of the decree, the WCDSS removed Tiffany R. from appellants' care and placed her with Mr. and Ms. S., who had care and custody of both Justin and Rodney. The Mauks consequently challenged the WCDSS decision to place Tiffany R. with the S. family by filing a Motion to Intervene in the guardianship proceeding. The circuit court granted the motion, but declined to return Tiffany to the Mauk home until completion of an evidentiary hearing to determine the best interest of the child.

On 24 July 1992, the Mauks filed a Countercomplaint for Declaratory, Injunctive, and Monetary Relief in the CINA action pursuant to 42 U.S.C. § 1983. The WCDSS responded to the Countercomplaint with a Motion to Dismiss. The Mauks requested the trial court to declare that WCDSS violated their rights under the Equal Protection Clause and to order that the WCDSS permanently return Tiffany to them. Moreover, both the Mauks and Mr. and Ms. S. filed cross-petitions for adoption on 29 September 1992. The WCDSS filed an Answer on 2 October 1992, and requested the circuit

court to sever the § 1983 action from the adoption proceedings. On 6 January 1993, the circuit court dismissed the Mauks' countercomplaint from the adoption action and ordered that it be brought in a separate action.

### Disposition of the 42 U.S.C. § 1983 Action

Appellants, individually, as next friend of Tiffany R., and as taxpayers of the United States and the State of Maryland, filed a Complaint for Declaratory and Injunctive Relief with the circuit court on 22 January 1993. In response, the WCDSS filed a Motion to Dismiss or, in the alternative, restated its Motion to Stay. On 22 March 1993, the Mauks filed not only a response in opposition to the WCDSS motion, but also filed a Motion for Partial Summary Judgment based on the circuit court's findings of fact in the adoption proceeding. The circuit court held a hearing on 27 April 1993 to decide the WCDSS's Motion to Dismiss or Stay. At the conclusion of the hearing, the court found that neither appellants nor Tiffany R. had a constitutionally protected liberty interest in preserving the foster family unit. On 26 May 1993, the court issued a written order dismissing appellants' civil rights action. The court declined to rule on appellants' Motion for Partial Summary Judgment because that motion had become moot following the court's dismissal of the action.

### Disposition of the Adoption Proceedings

During a preliminary hearing held on 29 January 1993, the circuit court determined that it needed an independent expert to evaluate both the Mauks and the S. family. Judge Moylan appointed Barbara DiCocco, a social worker, to perform the evaluation. The parties and court reconvened on 6 May 1993, at which time Ms. DiCocco presented her recommendations. DiCocco recommended that the child remain with the S. family. On 6 May 1993, Judge Moylan denied the Mauks' adoption petition and entered a decree for adoption in favor of John and Frances S.

On 27 May 1993, appellants filed an appeal of the circuit court's decision to dismiss their civil rights action. On 4 June

1993, their appeal of the circuit court's decision in the adoption proceedings followed. The Mauks' request to consolidate both the civil rights action and the adoption action for the purposes of this appeal was granted on 3 August 1993.

## FACTS

Tiffany R. and her two older brothers, all African–American children, were removed from the home of their biological mother in July 1990. At the time of her removal, Tiffany R. was approximately six months old and addicted to crack cocaine from birth as a result of her biological mother's drug abuse. In addition, it was discovered that Tiffany had been a victim of sexual abuse.

On 26 July 1990, each of the R. children was placed with separate foster parents because no relative or foster home could accept all three children. The WCDSS placed Tiffany with the Mauks, a Caucasian couple, who had a reputation for working well with infants born drug-addicted. Appellants had adopted a four-year old African–American female, Janae, and a four-year old biracial male, Dustin, both of whom previously had been foster children in their care.

When she entered the Mauk home, Tiffany's development was far below average for her chronological age. After one year in the care of the Mauks, however, Tiffany had reached the normal development range. Tiffany's pediatrician described the transformation as miraculous and attributed it to the attention that she received from appellants while in their care. Moreover, Tiffany formed a strong sibling relationship with the Mauks' adopted children.

Within two weeks of obtaining custody of Tiffany, Sylvia Mauk began inquiring about adoption. Mrs. Mauk testified that Tiffany's case worker from the WCDSS informed her that if the plan changed to adoption "it was likely ... we wouldn't be able to adopt her because she had siblings." Another caseworker told her that decisions as to whether to keep siblings together were made on a case-by-case basis and that the WCDSS refused to commit at that juncture. By July

1991, however, the WCDSS had determined that the long-term plan for Tiffany should be placement for adoption.

The WCDSS did little to ensure that Tiffany R. maintained contact with Justin and Rodney R. during her stay with the Mauks. Dr. Rebecca Hegar, a qualified foster care expert, testified that an attachment among the R. children, if broken, would lead to a "lifelong sense" of "loss" for the siblings. Purportedly in accordance with this view, on 5 November 1991, the WCDSS made a determination to place Tiffany with the S. family for the purposes of adoption. Interestingly, Mr. and Ms. S. admitted that, prior to the WCDSS plan, they had not devoted any attention to a potential adoption of Tiffany.

It is undisputed that the WCDSS made its institutional determination without consulting Tiffany's caseworker, her pediatrician, or its own resident psychologist. Both the case-worker and the pediatrician testified at the adoption proceeding that, had they been informed of the Department's intentions, they would have advised against it based on Tiffany's best interest. The WCDSS psychologist testified, in effect, that Tiffany's removal would be warranted only where there was "an extremely good reason."

At the time that it decided to pursue an adoption plan with Mr. and Ms. S., the WCDSS decided that appellants would not be suitable adoptive parents for Tiffany. On or about 16 March 1992, the WCDSS informed the Mauks that it intended to place Tiffany R. in an African–American foster home. Initially, it cited, as an obvious reason for its decision, a desire to reunite Tiffany R. with her brothers. In addition, the WCDSS admitted that the race of the potential adoptive parents was considered, but it was unable to explain what weight that factor was given in the overall evaluation. It noted its concern that there would be no integration of the children into the African–American community because the Mauks lived in a predominantly Caucasian neighborhood.

After appellants informed the WCDSS that they intended to challenge Tiffany's eventual removal from their home, the WCDSS cited additional, more accusatory, reasons for its

decision. The Department, based on statements allegedly made by Mrs. Mauk, asserted that Mr. Mauk was not involved sufficiently in the parenting process because he worked long hours and weekends. In addition, it claimed that Mr. Mauk's father had exhibited racial prejudice against their adopted African–American daughter for a period following her adoption. The WCDSS never contacted anyone to confirm or deny these allegations. At trial, the Department was unable to produce any evidence to substantiate its claim in this regard. Indeed, Mr. Mauk's father vehemently denied the allegation and testified under oath that he loved Tiffany as if she were his natural grandchild.

As a final basis for its decision, the WCDSS asserted that keeping the situation status quo would overburden the Mauks with "special needs" children and, therefore, it would not be in any of the children's best interests for Tiffany to remain in the Mauk household. It was undisputed, however, that for the purpose of State subsidies, neither Tiffany R. nor Janae Mauk was considered a "special needs" child.

On 29 March 1992, with the adoption battle well underway, Tiffany R. fell into a swimming pool. She was recovered unconscious, given CPR, and immediately taken to the hospital as a precautionary measure. The physicians who treated Tiffany advised WCDSS that it would not be in the child's best interest, following the trauma, to remove her from the Mauk household. Despite the hospital's advice in this regard, the WCDSS removed Tiffany R. from appellants' home on 31 March 1992 and placed her with the S. family. The record indicates that Child Protective Services confirmed the accidental status of the incident to WCDSS on 1 April 1992, but the Mauks were not informed of the finding until 15 April 1992.

Despite the findings of Child Protective Services, Tiffany R. was not returned to appellants' home. After a period of approximately two and one half weeks, the WCDSS, following a recommendation from its psychologist, consented to bi-weekly visitation between Tiffany R. and appellants. In May 1993, however, the Department inexplicably terminated the

Mauks' visitation privileges. As a result, appellants filed a countercomplaint in the adoption/guardianship proceedings, seeking, *inter alia, pendente lite* care of Tiffany, pending a final decision by the court on the child's adoption.

On 20 August 1992, the circuit court held a hearing to determine the *pendente lite* custody issue. The 20 August proceedings began what became a long and arduous task for the court of accumulating and evaluating the opposing sociological and psychological expert testimony offered by the parties. The WCDSS and its expert witnesses recommended not only a *pendente lite,* but also a permanent, placement for Tiffany R. in the S. home. The only expert testimony offered in support of appellants' position at the 20 August hearing came from Tiffany's pediatrician.

On 28 August 1992, the circuit court denied appellants' Request for Interlocutory Injunction and granted *pendente lite* custody of Tiffany R. to Mr. and Ms. S. with two-hour visitation periods between Tiffany and appellants twice a week. The visits, which were supervised by a licensed social worker, began on 16 September 1992[1] and continued until May 1993.

The circuit court held a hearing to resolve the parties' cross-petitions for adoption and consider testimony concerning the global issue of trans-racial adoption on 30 October 1992. Both parties presented expert testimony analyzing the importance of race in determining which placement would be proper for Tiffany R.

Unable to make a decision based on the expert testimony and fact witnesses presented by the parties, the court took the matter under advisement. After making its preliminary findings of fact on 20 December 1992, the circuit court, on 6 January 1993, ordered that a neutral expert evaluate the S. family and the Mauks. The court appointed Barbara DiCocco,

---

1. The social worker who supervised the first visitation period testified that, despite an absence of approximately four months, Tiffany R. immediately recognized the Mauks and referred to them as "Mommy and Daddy."

a licensed social worker, as the court's expert witness. On 6 May 1993, Ms. DiCocco recommended permanent placement in the S. home. Although she acknowledged that appellants were also a suitable adoptive family for Tiffany, Ms. DiCocco concluded that "Tiffany will suffer loss again if she is sent back to the Mauks. This will be debilitating to her development and well-being." Her ultimate conclusion was not based on the disingenuous accusations against the Mauks set forth by the WCDSS. Rather, her opinion rested on the potential for further harm to the child if she was removed yet again from an environment that the evidence suggests she considered to be her home.

Despite its protracted condemnation of the WCDSS for its atrocious handling of the case[2], the trial court adopted the position of Ms. DiCocco and signed an Order authorizing Tiffany R.'s adoption by Mr. and Ms. S. Judge Moylan concluded, *inter alia,* that:

The child is attached and is an integral part of that family [the S. family] and I think in her best interest I'm not prepared to take the risk and move her back to the Mauk home.... [t]o again remove her today from the S. home would be a third time for her and I'm not prepared to do that. I think it would be wrong. I think it was wrong when the Department of Social Services did it and I think it would be wrong if I were to do it now.

2. In particular, based on his extensive consideration of the evidence, Judge Moylan noted the following "grave injustices" committed by the WCDSS: 1) taking full advantage of the Mauks' skill in bringing Tiffany up to par developmentally while looking for an alternative same race family; 2) looking for a suitable African–American family without informing the Mauks; 3) using the pool accident as an excuse to remove the child from the Mauk household at a time when Tiffany needed stability; 4) overemphasizing sibling bonding as a major reason for placement with the S. family when its overall scheme was to seek out a same race placement for Tiffany; 5) wielding unsubstantiated claims of "marital discord" and racial prejudice against the Mauks; and 6) using race as the sole factor by which to make an initial judgment regarding permanent adoption placement.

### ISSUES

On appeal, the Mauks contest the trial court's conclusions in both the adoption proceedings and the constitutional claims brought by appellants under 42 U.S.C. § 1983. We have rephrased and reorganized their arguments as follows:

I. The trial court abused its discretion by granting the S.'s Petition for Adoption.

 A. The Mauks had the only valid petition for adoption before the court.

 B. The WCDSS violated various statutory provisions of the Family Law Article in deciding to place Tiffany R. with the S. family.

 C. The trial court abused its discretion by finding that it was in Tiffany R.'s best interest to be adopted by Mr. and Ms. S. rather than the Mauks.

II. The trial court erred in dismissing the Mauks' complaint under 42 U.S.C. § 1983 because the Mauks had standing to bring the claims.

 A. The Mauks have standing to state a claim under 42 U.S.C. § 1983.

 B. The Mauks were denied equal protection under the Fourteenth Amendment of the Constitution.

III. The trial court erred by granting the Motion to Dismiss appellants' 42 U.S.C. § 1983 claims.

Based on our thorough review of the record and the applicable law, we conclude that Tiffany R. should remain in her current adoptive placement with the S. family. Although we find the actions taken by the WCDSS with regard to the Mauks to be reprehensible, we are forced by constitutional restraints to affirm the trial court's dismissal of the Section 1983 action as well.

### I.

#### Standard of Review

The scope of appellate review of a trial court's decision in adoption proceedings is generally limited to whether the

trial court abused its discretion or whether the findings of fact by the trial court were clearly erroneous. *Coffey v. Dept. of Social Services of Baltimore City*, 41 Md.App. 340, 346, 397 A.2d 233 (1979). If it appears that the chancellor erred as to matters of law, further proceedings ordinarily will be required unless the error is determined to be harmless. *Id.*

Appellants do not dispute the findings of fact made by Judge Moylan. Rather, they contend that the trial court abused its discretion in denying their adoption petition in favor of Mr. and Ms. S. because: 1) the Mauks' Petition for Adoption was the only petition before the court; 2) the Mauks were entitled to a statutory preference due to their long-term foster parent status; and 3) it is in Tiffany R.'s best interest to be adopted by the Mauks. We disagree.

### A. The Validity of the S.'s Petition for Adoption

■ Appellants contest the validity of the trial court's adoption order because they argue that theirs was the only Petition for Adoption before the court. It appears from the record that, as a result of a clerical error, the Petition for Adoption submitted by Mr. and Ms. S. was not consolidated properly for trial with the Petition for Adoption filed by the Mauks. Appellants in no way allege that the court's consideration of the S. Petition resulted in an inability to argue the merits of their own petition. Indeed, the record indicates that all parties were given full opportunity to present their respective positions at the adoption and guardianship proceedings. Even though the error was corrected later by the trial court [3], the

---

**3.** The record makes apparent that, when the trial court entered its Order granting the S.'s Petition for Adoption of Tiffany R. on 6 May 1993, neither the court nor the parties were aware that the S. Petition had been filed under a different number than the Mauk Petition. No action was taken by the S.'s under the separate case number assigned to them. Consequently, the clerk of the circuit court notified them of the court's intention to dismiss their case. Because their Petition was being considered in full under a separate case number, the S.'s believed that there was no need for them to take any action on the separate case.

Apparently, following appellants' appeal to this Court, the discrepancy was brought to the attention of the trial court. In order to correct

Mauks request us to hold that the trial court abused its discretion, at the time of its ruling, by failing to recognize noncompliance by Mr. and Ms. S. with procedural rules allegedly governing adoption proceedings.

The record is devoid of any indication that appellants raised this issue during the adoption/guardianship proceedings. Judge Moylan, on several occasions, made perfectly clear that the court was evaluating both the Mauks' and the S.'s petitions. Appellants never objected to the trial court's references to, or reading and consideration of, the S. Petition. Moreover, when Judge Moylan ruled in favor of granting the S. Petition, the Mauks failed to object on the procedural grounds that they now present to us. An issue is properly before an appellate court only if was properly presented to the trial court and decided by it in the first instance. *Battista v. Savings Bank of Baltimore*, 67 Md.App. 257, 261 n. 2, 507 A.2d 203 (1986). Accordingly, we hold that this issue was not preserved for appeal.

### B. Alleged Statutory Violations by the WCDSS

Next, appellants claim that the trial court abused its discretion by failing to recognize that the WCDSS violated Maryland law by refusing to give them the preference for adoption based on their status as long-term foster parents. Moreover, the Mauks assert that the WCDSS wrongfully withheld its consent to their Petition for Adoption based solely on the factor of race. The trial court's insufficient regard for the statutory violations by the WCDSS, according to the

---

the technical mistake, the trial court issued an Order on 8 March 1994 which stated:

> Upon review of these proceedings by the court, *sua sponte*, it was discovered that this case was actually prosecuted in Case No. A [–] 2633, but through inadvertence, a motion for consolidation for trial was not filed and ordered. Therefore, the Notification to Parties of Contemplated Dismissal in these proceedings is moot.
>
> It is ORDERED this 8th day of March, 1994, that the Notification to Parties of Contemplated Dismissal is hereby withdrawn.

Mauks, warrants our reversal of its conclusion in favor of Mr. and Ms. S.

> The Family Law Article provides, in pertinent part, that:
>
> In developing a permanency plan that is in the best interests of a child under foster care, the local department shall consider the following, in the descending order of priority: ... (3) adoption in the following descending order of priority: (i) by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of time to have established positive relationship and family ties; or (ii) by another approved adoptive family.

Md.Code (1974, 1991 Repl.Vol.), § 5–525(c)(3) of the Family Law Article. The WCDSS claims that it factored the statutory preference into its consideration of which adoptive family to recommend, but rejected appellants in favor of the S.'s who had custody of Tiffany R.'s brothers and were of the same race as Tiffany.

Appellants seemingly assert that they were entitled to a "right of first refusal" to Tiffany based on the aforementioned portion of Section 5–525. This view is not in accordance with the plain meaning of the statute. The relevant provision clearly states that the agency must "consider" placement with a current long-term foster parent. It in no way mandates, however, that the agency *must* recommend placement with that parent.

■ Likewise, the Mauks contest the use of race, which they claim to be the "overriding" factor considered by the WCDSS in favor of the S. family. In support of their position that the extent of the WCDSS's reliance on race was illegal, appellants cite Section 5–311(b)(2), which states, in pertinent part, that:

> [t]he executive head of the child placement agency may not withhold consent for the sole reason that the race or religion of the prospective adoptive parents is different from that of the individual to be adopted or of the birth parents,

where to do so would be contrary to the best interests of the child.

The language of the statute demonstrates that it was enacted to resolve situations in which potential adoptive parents request consent from a child placement agency and are rejected based solely on their race or religion. In the case *sub judice*, however, appellants never requested the agency's consent to adopt Tiffany R. Instead, they waited until the agency made a choice on its own and then intervened. Thus, the WCDSS did not reject the Mauks because they were Caucasian; rather, it selected the S. family because it was a highly suitable African–American family that already had custody of Tiffany R.'s siblings. Accordingly, we hold that neither Section 5–525 nor Section 5–311 lends any support for appellants' position.

### C. Trial Court's Conclusion Regarding "Best Interest"

When deciding a contested adoption case, a trial court must employ the "best interest" standard. *In re: Adoption/Guardianship No. 10941,* 335 Md. 99, 642 A.2d 201, 210 (1994). The determination as to what would most appropriately serve the welfare and best interests of the child is made at the time of the final decision rather than at the time of the first hearing. *Crump v. Montgomery,* 220 Md. 515, 525, 154 A.2d 802 (1959), *following remand,* 224 Md. 470, 168 A.2d 355 (1960). The trial court may evaluate any number of factors when making a decision in an adoption proceeding. M.L.E., Adoption § 48 at 230 (1960). Each case is unique and this one is no exception.

The Mauks contend that the trial court abused its discretion in finding that the S. home was the proper adoptive placement for Tiffany R. They assert that Judge Moylan "blindly followed" the recommendations of the court-appointed expert and "ignored other relevant evidence." Indeed, a virtual myriad of expert testimony from medical, psychology, social work, and sociology professionals was presented by the parties for the trial court's ingestion. The majority of experts

who observed both families and Tiffany's interaction with them testified that, since her removal from the Mauks' home, Tiffany had developed strong bonding and emotional attachments to the S. family.[4] The experts presented by appellees also emphasized that the importance of keeping Tiffany with her biological siblings would increase over time. With the exception of Tiffany's pediatrician, all of the experts opined that transplanting Tiffany from the S. home back to the Mauks would only disrupt the child again.

Both parties produced experts to address the issue of race. The Mauks presented the testimony of a sociologist, Dr. Rita Simon, who had conducted a twenty-year study of 204 transracial adoptive families. Although she did not observe Tiffany with the Mauks or the S. family, Dr. Simon opined that children in transracial adoptive families, such as the Mauk family, generally have an enhanced sense of racial identity. In contrast, appellees' expert, Dr. Rebecca Hegar, specifically evaluated Tiffany's placement and then concluded that the ideal adoptive parents would provide the child with the ability to "meet their long-term needs for association ... with their kinship network, [and] with their own ethnic or racial group." Based on this, and additional factors cited above, Dr. Hegar opined that the S. family was the proper placement.

The trial court also considered the opinions of individuals appointed by the court to make impartial determinations. Alex Bognar, an attorney appointed by the trial court to represent Tiffany R., explained that "it would not be in her [Tiffany R.'s] best interest to look to the past at what happened, but to look to the present.... I don't think another separation would benefit her ... and it wouldn't be in her best interest to remove her."

---

4. At the 20 August 1992 hearing, the WCDSS psychologist, Dr. Gregory Powell, testified that, based on the previous bonding that occurred between Tiffany and the Mauk family, a parental reattachment with them could be easily re-established. Yet, at that hearing and the one held on 30 October 1992, Dr. Powell opined that Tiffany had developed strong bonding and emotional ties to the S.'s who provided her with "high quality parenting."

Moreover, the trial court acknowledged that it relied on the recommendations of Ms. DiCocco, the court-appointed expert and social worker, who observed both families and Tiffany's interaction with them. DiCocco found that both the Mauks and the S. family were suitable adoptive families and that Tiffany's strongest relationship was with the Mauks' adopted daughter, Janae. Yet, DiCocco concluded that Tiffany should remain with the S. family because Tiffany would "suffer loss again if sent back to the Mauks." DiCocco further opined that moving Tiffany again would be "debilitating to her development and well being[,] ... harmful and not in ... [her] best interest."

The trial court's summation of its findings indicates that it considered thoroughly all issues raised by the parties. Although it acknowledged that the "same-racial makeup" was a factor in its decision, the court concluded that it was not the "overriding" factor. Rather, as stated *supra,* the court cited, as the determinative factor, the expert testimony suggesting removal from another family to which Tiffany had become attached would have a negative impact on the child's development.

We concur with Judge Moylan's conclusion that the WCDSS committed a "grave injustice" against the Mauks when it removed Tiffany from their home. The best interest of the Mauks, however, was not the proper focus of the trial court's inquiry. We hold that the trial court made a well-informed and rational decision when it concluded that Tiffany's interests would best be served by adoptive placement with the S. family. Accordingly, we affirm.

## II.

The Mauks also appeal the decision of the trial court to dismiss their claims under 42 U.S.C. § 1983 [5] in which they

---

**5.** Section 1983 provides, in pertinent part, that:

Every person who, under color of any statute, ... of any State ... subjects, or causes to be subjected, any citizen of the United States or

alleged that actions taken by the WCDSS in the handling of the Tiffany R. adoption proceedings violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment. This is a case of first impression in Maryland. Throughout our analysis, therefore, we shall look for direction from other courts that have decided the issues presently before us. A review of the relevant precedent reluctantly leads us to conclude that the trial court's decision should not be disturbed.

### Standard of Review

Pursuant to Maryland Rule 2–322(b), in reviewing a disposition by granting a motion to dismiss, "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492 (1986); *Baker, Watts, & Co. v. Miles & Stockbridge*, 95 Md.App. 145, 186, 620 A.2d 356 (1993). Moreover, we consider the "well pleaded allegations" in the light most favorable to the Mauks. *Berman v. Karvounis*, 308 Md. 259, 264, 518 A.2d 726 (1987).

### A. Violation of the Mauks' Right to Due Process

The trial court dismissed appellants' Section 1983 action because it determined that they did not have a protected liberty interest under the Due Process Clause of the Fourteenth Amendment. Relying on federal precedent, Judge Moylan concluded that "there is no liberty interest in the continuation of foster care or [in] the right of foster parents to adopt." In addition, the trial court found that the Mauks had no standing to seek relief either on behalf of Tiffany R. or as taxpayers.

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

In order to sustain their due process claim, the Mauks must show that they were deprived of a federally secured right by persons acting under color of state law. *Wassif v. North Arundel Hosp. Assn. Inc.*, 85 Md.App. 71, 78, 582 A.2d 269 (1990). Appellants do not contend that the applicable statute, Section 5–525(c) stated *supra*, is unconstitutional; rather, they assert that the application of that law by the WCDSS was violative of their protected liberty interest as foster parents, next friend of Tiffany R., and taxpayers of Maryland.

### 1. Standing As Foster Parents

Appellants claim that they have standing to assert a due process violation because 1) they were entitled to a statutory preference in the adoption of Tiffany R.; and 2) they became Tiffany R.'s "psychological" family during their period of foster care with her. We have concluded already, *supra*, that the language of Section 5–525(c)(3) in no way guaranteed Tiffany R.'s placement with the Mauks. Our analysis of appellants' standing in this regard is limited to their claimed role as Tiffany's "psychological" family.

Foster care is a statutory creation that enables the state to maintain ultimate responsibility for children without having to care for them on a daily basis. *See* Section 5–525(b) of the Family Law Article. The foster care system clearly was designed as a transitional program from which children under the care of the state eventually would be returned to their biological parents, placed with relatives, or adopted by an appropriate family. *See id.* at Section 5–525(c).

The ephemeral nature of the foster care relationship was discussed at length by the Supreme Court in *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) [hereinafter *OFFER* ]. Although the *OFFER* Court did not find it necessary to resolve whether foster parents enjoyed a protected liberty interest in parental rights, both Justices Brennan and Stewart discussed the foster parents' due process claim in detail. Speaking for the Court, Justice Brennan noted that while "the usual understanding of 'family' implies biological relationships,

... the importance of the familial relationship, to the individuals involved and to society, stems from the emotional attachments that derive from the intimacy of daily association." *OFFER*, 431 U.S. at 843–44, 97 S.Ct. at 2109. He highlighted, however, the contrast between the defined liberty interests of biological parents that stem from blood relationships and the foster parental contract that has its "origins in an arrangement in which the state has been a partner from the onset." *Id.* at 845, 97 S.Ct. at 2110. In this context, Justice Brennan emphasized that "where ... the claimed interest derives from a knowingly assumed contractual relationship with the state, it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Id.* at 846, 97 S.Ct. at 2110. In his concurring opinion, Justice Stewart expanded upon Justice Brennan's commentary by remarking that "any case where the foster parents had assumed the emotional role of the child's natural parents would represent not a triumph of the system, to be constitutionally safeguarded from state intrusion, but a failure." *Id.* at 861, 97 S.Ct. at 2118.

The dicta contained in the *OFFER* decision has lead a number of courts to conclude that foster parents do not enjoy a constitutionally protected liberty interest as a child's psychological family. *See e.g., Kyees v. County Dep't of Public Welfare*, 600 F.2d 693, 694 (7th Cir.1979) ("Because they can be ended by the state, foster families must, then, be seen as enjoying considerably more limited 'liberty' than natural families or those related by adoption."); *Drummond v. Fulton County Dept. of Family and Children's Services*, 563 F.2d 1200, 1207 (5th Cir.1977), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978) ("[I]n the eyes of the state, which creates the foster relationship, the relationship is considered temporary at the outset and gives rise to no state created rights in the foster parents"); *DeWees v. Stevenson*, 779 F.Supp. 25, 28 (E.D.Pa.1991) ("Foster parents do not have a cognizable liberty interest in maintaining a relationship with a foster child vis-a-vis prospective adoptive parents, particularly where the relationship is based on a contract under which the state retains responsibility for the child and places him in a

foster home on a temporary basis."); *Sherrard v. Owens*, 484 F.Supp. 728, 742 (W.D.Mich.1980), *aff'd*, 644 F.2d 542 (6th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981) ("[A]ny expectation of 'family' continuity or permanency based upon the provisional foster family license ... was totally unreasonable."). These authorities are consistent and persuasive in their analysis that foster parents lack standing to assert violations of a constitutionally protected liberty interest.

Because the foster parent relationship is a creature of statute and because it has not been recognized as legally equivalent to either the biological family or adoptive family, we are obliged to conclude that the preservation of the foster care family unit for adoptive purposes is not a liberty interest protected by the Constitution. Indeed, any interest arising from the foster care relationship is limited to that derived from the laws that create it. *See Drummond*, 563 F.2d at 1207.

### 2. Standing As Next Friend of Tiffany R.

Appellants also claim that, as foster parents, they are entitled third-party standing to assert purported constitutional violations against Tiffany R. They rely primarily on *McLaughlin v. Pernsley*, 654 F.Supp. 1567 (E.D.Pa.1987), to support their position. In *McLaughlin*, an African–American infant was placed in an emergency foster home with Caucasian foster parents. *McLaughlin*, 654 F.Supp. at 1570. Approximately two years later, the social services agency that placed the child with the Caucasian couple removed him and placed him with African–American foster parents. *Id.* at 1571. The Caucasian foster parents sued the social services agency, claiming that the sole reason the child was removed from their care was their race. *Id.* Relying on the *Smith* decision, the federal district court held, and the Third Circuit affirmed, that "foster parents have standing to raise the rights of foster children in a federal forum." *Id.* at 1583. Later, however, when the Caucasian couple sought a preliminary injunction for the return of the child to their foster care, the federal district

court recognized the limitations of the couple's Due Process Clause protection. *See McLaughlin v. Pernsley,* 693 F.Supp. 318, 325 (E.D.Pa.1988), *aff'd,* 876 F.2d 308 (3rd Cir.1989) ("The plaintiffs do not argue that the liberty interest they claim ... sources from the Due Process Clause itself. In light of the Supreme Court's decision in ... [*OFFER,*] such an argument by the plaintiffs might have little force.") [hereinafter *McLaughlin II* ]. Thus, neither *McLaughlin* nor *McLaughlin II* clearly stands for the specific proposition that appellants are seeking to advance under the Due Process Clause.

In addition, the facts of *McLaughlin* are distinguishable from the case *sub judice.* In *McLaughlin,* the Caucasian foster parents sought to regain custody of the child for extended foster care, not for adoptive purposes. *McLaughlin,* 654 F.Supp. at 1582. Thus, there were no adoption proceedings prior to the court's consideration of the Section 1983 action from which the court could conclude definitively who was responsible for the guardianship of the child. *See id., quoting OFFER,* 431 U.S. at 841 n. 44, 97 S.Ct. at 2107 n. 44 ("[T]heir [the children's] interest is ordinarily represented in litigation by parents or guardians. In the instant case, however, the State, the natural parents, and the foster parents, all of whom share some portion of the responsibility for guardianship of the child, ... are parties."). In contrast, by the time appellants' Section 1983 action was presented, the trial court already had signed the Adoption Decree in favor of Mr. and Ms. S. This decree of adoption made Mr. and Ms. S., as well as her court-designated independent counsel, the definitive guardians of Tiffany R.'s interests.[6] *See* Maryland Rule 2–202(b) ("An individual under disability to sue may sue by a guardian or other like fiduciary or, if none, by next friend.").

Even assuming, *arguendo,* that appellants had standing to argue on behalf of Tiffany R., existing authority indicates that a foster child has no recognized liberty interest in remaining

---

6. In addition, we note that the Mauks' own interests in the outcome of the Section 1983 litigation, in fact, may conflict with Tiffany R.'s best interests.

with a specific foster care family. *See Drummond,* 563 F.2d at 1207–09 (ruling that an infant of tender years enjoys no constitutional interest in a "stable environment" where the state's motive in interrupting the child's environment at any point was always to move him to a place which it considered "superior ... for his particular needs"). The trial court properly dismissed the Mauks' claims raised on behalf of Tiffany R.

### 3. Standing Based on Taxpayer Status

Appellants claim that, as recipients of state and federal funds for their role as foster parents, they have taxpayer standing to challenge the WCDSS actions against them. Under Maryland law, " 'taxpayers have standing to bring suit to challenge the constitutionality of a statute when the statute[,] as applied[,] increases their taxes.' " *State v. Burning Tree Club, Inc.,* 315 Md. 254, 291, 554 A.2d 366 (1989), *quoting, Murray v. Comptroller,* 241 Md. 383, 391, 216 A.2d 897, *cert. denied,* 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966). In the instant case, the Mauks have failed to prove how the alleged racially discriminatory use of state and federal funds by the WCDSS would result in an actual or potential increase in the Mauks' taxes. Whether Tiffany R. was placed with the S. family or the Mauks, the tax liability would be the same. Accordingly, appellants' contention is illogical and without merit.

### B. *Violation of the Mauks' Equal Protection Rights*

The Mauks assert that the WCDSS refusal to place Tiffany R. with the Mauks for permanent adoption violated their and Tiffany R.'s equal protection rights. Appellants do not dispute the validity of Section 5–525(c) of the Family Law Article, stated *supra,* that, in effect, grants local social service agencies the ability to consider race when making adoptive placement recommendations. Rather, they challenge the WCDSS's alleged misapplication of the statute. The Mauks argue that the trial court erred by failing to conduct a strict scrutiny analysis to determine that the WCDSS impermissibly used

race as the sole determinative factor in favor of Tiffany's placement with the S. family.

The WCDSS admits that it considered the race of the prospective adoptive parents, but argues that it considered the reunification of Tiffany R. with her biological siblings to be the paramount factor in reaching its ultimate recommendation. During his consideration of the agency's Motion to Dismiss the Section 1983 action, Judge Moylan did not make findings of fact regarding the grounds specified by the WCDSS that lead to its recommendation in favor of Mr. and Ms. S. That discussion was limited to his findings of fact during the adoption proceedings.

Judge Moylan initially found that, although race was the "overriding decisive factor" considered by the agency, the WCDSS also treated the reuniting of the siblings issue as a "genuine consideration." Later, however, during his final findings of fact related to the adoption proceedings, Judge Moylan retracted his earlier finding and stated that the only reason cited by the WCDSS for its decision

> that gave me some trouble was the reuniting of Tiffany with her siblings. And ... the reason why I think even that reason was disingenuous was the fact that during the twenty months while Tiffany was with the Mauks, the visitation between her and her two brothers was pretty sporadic or spotty and it certainly was not given any great attention or importance at the time, and then all of a sudden it became a principle [sic] reason for the basis for the adoption.

While race may be considered legitimately as one of the factors in making the ultimate placement decision, *see e.g.,* *J.H.H. v. O'Hara,* 878 F.2d 240, 244 (8th Cir.1989) ("race may be considered as a relevant factor in determining the best interest of the child"); *Drummond,* 563 F.2d at 1205 ("consideration of race in the child placement process suggests no racial slur or stigma in connection with any race. It is a natural thing for children to be raised by parents of their same ethnic background"); *Petition of R.M.G.,* 454 A.2d 776, 788 (D.C.App.1982) ("the use of race, as one factor, may be

necessary to serve the best interest of the child"), courts that have addressed the issue agree that race may not be used in an automatic fashion to prescribe the appropriate adoptive placement. *See e.g., Palmore v. Sidoti,* 466 U.S. 429, 434, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) ("The effects of racial prejudice, however real, cannot justify a racial classification removing an infant child from the custody of its natural mother found to be an appropriate person to have such custody."); *McLaughlin II,* 693 F.Supp. at 324 ("[I]t is evident from these plain observations that use of race as the *sole criterion* in making proper long-term foster care placements of black foster children is inadequate[.]") (emphasis in original); *see also Compos v. McKeithen,* 341 F.Supp. 264, 266 (E.D.La.1972) (invalidating a statutory prohibition on interracial adoption by concluding that "the necessity for racial matching of parent, or parents, and child in adoption to promote the best interests of the child, and the reasonableness of that racial classification in light of that purpose cannot be sustained"); *In re Moorehead,* 75 Ohio App.3d 711, 600 N.E.2d 778, 786 (2 Dist.1991) ("The difficulties inherent in interracial adoption justify consideration of race as a relevant factor in adoption, but do not justify race as being the determinative factor.").

In the instant case, the trial court, in the adoption proceedings, found that the WCDSS had used race as the sole criterion by which to judge the appropriate placement for Tiffany R. The agency's purported inability to explain, through documentation or testimony, how it quantified race in relation to the other factors, its fabrication of the unsubstantiated claim of racial prejudice against Mr. Mauk's father, and the improper manner in which it removed Tiffany from the Mauk home all lent support to the trial court's conclusion. The trial court never specifically decided the equal protection claim raised by appellant. Rather, it merely focused on the liberty interest analysis required under the due process inquiry. Consequently, it neglected to address the issue initially raised during the adoption proceedings. Thus, the trial court presiding over the Section 1983 action erred by failing, after

considering the facts in a light most favorable to appellants, to conclude that the WCDSS had violated the Mauks' equal protection rights.

 Though the trial court erred by finding that the Mauks' constitutional claims were without merit, we hold that the error was harmless because, at the time it considered the motion, the Mauks were left without any discernible remedy. The injunctive and declaratory relief sought by appellants had become effectively moot by the trial court's independent ruling in the adoption proceedings.

### III.

 We shall consider briefly the Mauks' claim for monetary relief under Section 1983. Appellants attempted to sue under Section 1983 both the WCDSS and David A. Engle in his official capacity as Director of the WCDSS. The trial court dismissed the claims. The Mauks now argue that the trial court "was required to look beyond Engle's classification under State law and focus on the particular [local] function which was being performed at the time." We disagree.

"With regard to an action for money damages, neither a state nor a state agency nor a state official *sued in his official capacity* is a 'person' within the meaning of § 1983." *Ritchie v. Donnelly*, 324 Md. 344, 355, 597 A.2d 432 (1991). In *Ritchie v. Donnelly*, the Court of Appeals noted that a trial court must look at the particular function that a state official is performing to determine the official status for Section 1983 purposes. *Id.* at 357, 597 A.2d 432. If a particular state official serves in both a state and local capacity, the official may be classified as a "person" under Section 1983 if acting in his or her *local* official capacity. *Id.* (citing *Dotson v. Chester*, 937 F.2d 920, 927 (4th Cir.1991), in which the Fourth Circuit held that, for § 1983 purposes, a sheriff may be considered a state official when arresting a suspected lawbreaker but a local official in operating a county jail).

In contrast to the situation presented in *Dotson*, the Mauks have not asserted which particular duties performed by Engle

would classify him as a local official. Rather, they assert that further fact-finding possibly could have revealed that "the particular function which was being performed at the time" Engle decided to recommend Tiffany R. for placement with the S. family was a local one. A close examination of the analysis employed by the Fourth Circuit in *Dotson*, however, indicates that Engle was acting as a state, rather than county, official when he made the recommendation.

In *Dotson*, the Fourth Circuit focused on the standard set forth by the Supreme Court in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), that "only those municipal officials who have 'final policymaking authority' may by their actions subject the [local] government to § 1983 liability." *Dotson*, 937 F.2d at 924, *quoting Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924. In *Praprotnik*, the Court held that "the identification of policymaking officials is a question of state law," *Praprotnik*, 485 U.S. at 124, 108 S.Ct. at 924, because "state law will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 125, 108 S.Ct. at 925.

An examination of the relevant state law in the case *sub judice* leads us to conclude that Engle did not enjoy "final policymaking authority" over the WCDSS. The statutory provision authorizing the creation of the local social services departments and enumerating the responsibilities of the local directors, Md.Code (1957, 1991 Repl.Vol.), Art. 88A § 13(c), states, in pertinent part, that "[t]he local director in each county, . . . shall administer within his respective county social service and public assistance activities, . . . in accordance with § 3 of this article. Each local director has a general administrative responsibility to the State Administration." In turn, Section 3 of Article 88A defines the powers and duties of the SSA. *See* Art. 88A, § 3(a)(1) ("All of the activities of the local departments in the counties and in Baltimore City, which the State Administration finances, in whole or in part, shall be subject to the supervision, direction and control of the State Administration."). Thus, state law makes clear that a local

social services director merely functions as the arm of the SSA in each of Maryland's counties and Baltimore City. *Cf. Manders, et al. v. Brown, et al.*, 101 Md.App. 191, 203–18, 643 A.2d 931, 937–44 (1994) (discussing potential boundaries of immunity for state legislative officials whose duties are not set forth specifically by statute).

The relevant statutory provisions delineate that Engle did not have "final policymaking authority" over the recommendations process employed by the WCDSS. The ultimate authority rested with the SSA. Although the action taken by Engle against the Mauks was in no way commendable, we hold that he is cloaked with immunity against monetary liability under 42 U.S.C. § 1983 because he acted as a state official. Therefore, we must affirm the circuit court's decision to dismiss appellants' civil rights action.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY THE WASHINGTON COUNTY DEPARTMENT OF SOCIAL SERVICES.[7]

---

7. Under Md.Rule 8–607(a), we customarily assess costs against the losing party. This award is discretionary and, where the irresponsibility of the winning party creates the basis for appeal, we may order it to shoulder the costs. *See e.g., Md. Auto Ins. Fund v. Sparks,* 42 Md.App. 382, 396, 400 A.2d 26 (1979); *Andre v. Montgomery Co. Personnel Bd.,* 37 Md.App. 48, 65, 375 A.2d 1149 (1977). In the instant case, we noted throughout that actions taken by the Department against the Mauks lead the Mauks to appeal the trial court's decision. We conclude that the Department's fault in this regard, recognized initially by the trial judge, requires that it should bear the costs of appeal.